**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**Cleveland KIMBROUGH, Defendant-
Appellant.**

**No. 72–3578.**

United States Court of Appeals,
Fifth Circuit.

July 9, 1973.

Drayton Nabers, Jr., Birmingham, Ala., court appointed, for defendant-appellant.

Wayman G. Sherrer, Albert C. Bowen, Jr., Birmingham, Ala., for plaintiff-appellee.

Before GEWIN, THORNBERRY and SIMPSON, Circuit Judges.

GEWIN, Circuit Judge:

On May 18, 1972, a two-count indictment was returned charging the appellant with passing, uttering and publishing two counterfeit Federal Reserve Notes in violation of 18 U.S.C. § 472. A jury found him guilty on each count and a sentence of two consecutive five year terms was imposed.[1]

On this appeal, Kimbrough presents two contentions which he maintains require a reversal of his conviction. First, he asserts that the Government failed to present substantial evidence that he passed the two counterfeit bills with the requisite guilty knowledge. Secondly, he alleges that the in-court identification by the prosecution witnesses was tainted by an unfair pretrial photographic identification. After a careful review of the evidence adduced

---

1. The record reveals that appellant was convicted of robbery in 1959 in New York.

at the trial and the applicable legal standards which guide our review of appellant's contentions, we conclude that no error was committed and affirm.

### I.  The Facts

On December 17, 1971, a man entered a Bessemer, Alabama store and requested two tens as change for a twenty from Rodney Porterfield, a clerk in the store. Porterfield referred him to A. E. Davis, the store manager.  Agreeing to the exchange, Davis gave the man the requested two tens.  Further examination of the bill by Davis led him to conclude that it did not "look right", but by that time the man who presented it had left.

In hopes of quieting their suspicions, Davis and Porterfield went to a neighboring store to get another opinion as to the bill's genuineness.  Their neighbor responded that he didn't think it looked counterfeit.  Upon returning to their store, however, Davis made a side by side comparison of the suspected bill with other twenties in his cash register and determined that it was counterfeit.

On the day following the Bessemer incident, a man entered the Mary Carter Paint Store in Alabaster, Alabama and asked the store clerk, Mrs. Mable Langston, for two packs of cigarettes.  Mrs. Langston testified that the man tendered a twenty dollar bill and she gave him the change.  She stated further that he engaged her in a short conversation and then casually walked out of the store.  Mrs. Langston said she had become suspicious of the man because he thanked her several times and that he acted "too nice."

She watched him as he left the store and noticed that he had not parked directly in front of her store but instead

on the highway some 100 feet away. She considered this conduct unusual since directly in front of the store there was a parking lot which could hold ten or twelve cars and at that time it was virtually empty.  She saw the man get in a black over maroon Cadillac with out of state license plates and drive away. Langston immediately checked the twenty with a counterfeit list supplied by a local bank and discovered that it was counterfeit.

On February 5, Agent Robert Pettway, who was assigned to the case, showed A. E. Davis a series of six photographs of possible suspects at the Bessemer store.  The photographs had been scrambled by Pettway and stacked one on top of the other.  Davis was positive in his identification of the photograph of appellant as the man who had presented him the counterfeit twenty dollar bill for change.  Additionally, both Porterfield and Langston were able to identify the appellant from the series of photographs when each was presented the series by Pettway on the same day. At trial, Davis, Porterfield, and Langston positively identified appellant as the person who had presented the counterfeit twenty dollar notes.

Special Agent George Hudson, who is an expert in counterfeit notes, testified that the two notes presented to Davis and Langston were definitely counterfeit.  He stated that they had been manufactured in the same location in Buffalo, New York.  He testified that approximately 77 of these notes turned up in the Birmingham area during December 1971.

Subsequent to appellant's identification, he was arrested on February 25, 1972, at his Carbondale, Illinois apartment.[2]  No counterfeit money was found

2. Prior to his arrest appellant had been interviewed on January 15, 1972 by special agent Martin Venker at his apartment in Carbondale.  Agent Venker testified that he advised appellant of his *Miranda* protections and appellant responded that he fully understood these protections. Upon request appellant refused to execute

a written waiver of rights form but nevertheless agreed to answer some questions. Venker stated that appellant had told him that he had been traveling extensively during the December 1971 period.

Appellant stated that he had traveled from Illinois down to Birmingham then on to New Orleans and then on to Erie,

on appellant's person, in his apartment or in his car at the time of his arrest. At trial, appellant stated that he had around $2,500 at the time of his arrest. He stated further that he owned a diamond ring valued at $2,000.

Apparently, appellant had been a dental technology student at the University of Illinois in Carbondale from 1969 until 1971. He stated that he had difficulty in obtaining a job after his graduation but he had been employed at various places for limited amounts of time. This testimony conflicts with Agent Venker's testimony to the effect that appellant told him that he had not been employed for some four years.

Appellant stated that prior to entering the University of Illinois he had accumulated a savings of $10,000 from two jobs to help pay for his education. He claimed that he still had some of these savings when he was arrested in early 1972. He testified that the rest of his wealth had come from gambling ventures including a trip to New Orleans after Christmas in 1971 when he won over $1,200 at the track. Appellant also admitted that he had been in Buffalo, New York, the alleged place of origin of the counterfeit money, during the December, 1971 period.

Appellant admitted being in Birmingham during the period when the counterfeit bills had been passed but denied ever being in the Bessemer store or the Mary Carter Paint store. He contended that he had never seen Davis, Porterfield, or Langston. In an attempt to refute Mrs. Langston's testimony, he asserted that on the weekend in question his car had been in Don Drennen's Cadillac shop in Birmingham for repairs.

However, Robert McComb, an employee of Don Drennen's, testified that his records tended to show that even though appellant's car may have been in the shop for minor repairs it had not been held there overnight.

## II. The Sufficiency of the Evidence

In all criminal cases, skilled and diligent counsel for appellants can point to circumstances which could possibly generate doubts in the minds of jurors.[3] However, it is not our function to disturb verdicts of juries only because the possibility of doubt can be generated by skillful and ingenious arguments. The conclusion reached by the jury must be upheld if supported by substantial evidence, including reasonable inferences drawn therefrom as viewed in the light most favorable to the Government.[4]

After a careful review of all the facts adduced at appellant's trial, we believe that substantial evidence was presented from which the jury could reasonably infer that appellant had the requisite guilty knowledge when he passed the counterfeit bills in question. Although not of controlling importance, we note at the outset that appellant's defense strategy was somewhat different at trial from what it has been on this appeal. During his trial, appellant continually attempted to prove that he had not even passed these bills. Now however, he asserts that even if he passed them, no evidence was presented that he knew they were counterfeit. Of course it was still incumbent on the Government to offer substantial evidence in proof of this vital element of its case against the appellant.

---

Pennsylvania. He stated further that he had been in Buffalo, New York during this period. Venker testified that appellant told him that he had over $2,600 which he had won in various gambling pursuits. Venker stated that at that time appellant owned a black over maroon El Dorado Cadillac with Illinois plates. At this time Venker examined appellant's car and found no counterfeit money. Venker also examined appellant's safe-deposit box

and found $1,000 in cash which was genuine but he found no counterfeit currency.

3. Court appointed counsel in this case presented an excellent brief to the court and delivered a forceful oral argument upon the appellant's behalf.

4. See, Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); Peters v. United States, 376 F.2d 839 (5th Cir. 1967).

Since we feel that the evidence presented would surely permit the jury to conclude that he had indeed passed these counterfeit notes, we approach this issue then solely as to whether there was substantial evidence that the appellant knew that the bills were counterfeit when he passed them. Knowledge is an elusive element of any crime, and short of a confession by the accused it can seldom be proved by direct evidence. Thus in the usual case the jury will have to rely on circumstantial evidence presented by the Government to find this needed element.

The scope of the jury's inquiry is not limited. We have stated:

> Guilt and knowledge seldom can be shown by direct evidence, and the Jury may scrutinize the entire conduct of the defendant at or near the time when the money was passed.[5]

We feel that the jury could have reasonably inferred the element of guilty knowledge by scrutinizing all the surrounding facts in the instant case. In Bessemer appellant asked for two tens for a twenty, a rather unusual request. In Alabaster he was highly solicitous and had parked his Cadillac some distance away from the store. These two transactions took place within a two-day period. He admitted being in Buffalo, New York, the origin of the counterfeit bills. When arrested he possessed an excessive amount of cash and other valuable possessions even though he had not been employed for several years. Viewing the above factors, we conclude that there was sufficient circumstantial evidence for the jury to infer the needed element of knowledge beyond a reasonable doubt.

### III. The In-Court Identification

■ Secondly, appellant asserts that the in-court identification by the Government witnesses was materially and substantially influenced by the photographic identification obtained by the government prior to trial. Our examination of the photographs and a review of the facts surrounding the presentation of the photographs to the Government witnesses prior to trial and their subsequent positive identification of appellant at trial leads us to a different conclusion. The use of photographic identification for apprehending felons is a necessary and regular criminal investigative technique.

In Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968) the Supreme Court delineated some of the dangers inherent in the use of photographs as an investigative technique. While recognizing some of the problems with such identification processes, the Court refused to adopt any per se rule for exclusion purposes. Mr. Justice Harlan stated for the Court that:

> . . . [W]e hold that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial *following a pretrial identification by photograph will be set aside on the ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.* 390 U.S. at 384, 88 S.Ct. at 971. (Emphasis added)

Thus *Simmons* establishes a two pronged test for determining if an in-court identification by a proffered Government witness will be excluded.

■ First, a court must determine if the photographic spread is impermissibly suggestive. This court has previously explicated the scope of inquiry under this prong of the *Simmons* test as follows:

> We reiterate . . . *that only the picture spread itself must be evaluated in determining if it meets the standard*—whether other more desirable methods of identification (e. g. a line-up) were available, or whether

---

5. Paz v. United States, 387 F.2d 428, 430 (5th Cir. 1967).

there was a compelling need for speedy identification, are just not relevant to a determination of the impermissibly suggestive issue. United States v. Sutherland, 428 F.2d 1152, 1156 (5th Cir. 1970) (Emphasis added)[6]

Only when the trial court finds that the photographic spread was impermissibly suggestive is there any need for a determination of whether there was "a very substantial likelihood of irreparable misidentification" from the proffered witness at trial.

We are somewhat confused on the thrust and focus of appellant's *Simmons* contentions. Davis, Porterfield, and Langston identified the appellant as the one who had passed the bills as a result of direct examination by Government counsel at trial.[7] On cross-examination, defense counsel attacked the credibility of the witnesses' identification by showing that the photographic spread shown to them by Agent Pettway was not fairly representative of the age group and body size of the appellant. In response to defense counsel's cross-examination of these witnesses, the Government moved to introduce the photographic spread so the jury itself could determine if the photographs shown to the witnesses were fairly representative.

Defense counsel then objected to the introduction of the photographic spread and attempted to obtain a ruling that the spread was not fairly representative. A voir dire examination of Agent Pettway was conducted to determine the issue of admissibility. He stated that six photographs were shown to the witnesses. The photographs were randomly shuffled in a stack. No attempt was made to influence the witnesses, and each viewed the photographs separately. Of the six photographs, three men were not fairly representative of the body size and age of the appellant. However the men in the remaining three photographs were similar in body size and age. After viewing the spread, the court ruled that as a matter of law the spread was not impermissibly suggestive and permitted its introduction for the jury's examination.

We believe that this determination was not clearly erroneous. Although some of the photographs did not fairly represent the appellant, others did, and we feel this cured any possible defect. Our conclusion is buttressed by the fact that each of the witnesses positively and unequivocally identified the appellant at trial. Although each of the witnesses could not recall the appellant's dress with 100% accuracy, they did recall his overall characteristics. The trial court correctly concluded that the photographic spread as a whole was not impermissibly suggestive and that the circumstances surrounding its presentation did not make it so. We believe the defendant was accorded a fair trial and accordingly affirm.

Affirmed.

---

6. Of course the court must consider the facts surrounding the presentation of the photographic spread for a full determination of the *Simmons* issue.

7. We note that appellant made no prior or contemporaneous objection to the in-court identification by these witnesses.