**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**George H. SNOW, Defendant-Appellant.**

**No. 81–1462.**

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 17, 1981.
Decided Feb. 12, 1982.

Dennis P. Coffey, Milwaukee, Wis., for defendant-appellant.

James W. Morrison, Asst. U. S. Atty., Milwaukee, Wis., for plaintiff-appellee.

Before CUMMINGS, Chief Judge, and WOOD and CUDAHY, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

Defendant-appellant George H. Snow appeals from a judgment of conviction entered upon jury verdicts of guilty of four counts of passing, and one count of possessing, counterfeit Federal Reserve Notes. He was sentenced to five concurrent two-year terms of imprisonment. Essentially only one argument is raised on appeal: whether

evidence that Federal Reserve Notes are allegedly worthless was properly excluded. We affirm.

### I.

Viewing the evidence in the light most favorable to the Government, *see Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Aviles*, 623 F.2d 1192 (7th Cir. 1980), the facts are, as follows. During the early evening hours of Friday, November 7, 1980, Snow and his friend Lavern Mikesell entered Rickey's Tavern in the City of Milwaukee, Wisconsin, having driven there together from Tigerton, Wisconsin. When told by Larry Kocourek, a bouncer at Rickey's, that a $1.50 per person cover charge was required, Snow gave Kocourek a counterfeit twenty-dollar bill, receiving $17.00 in genuine currency in return. At Rickey's that night, a customer also placed a counterfeit twenty-dollar bill into the waistband of the costume of Victoria Huber, a dancer.[1]

Upon examining them, both Kocourek and Huber suspected, correctly it turns out, that the bills which had been passed in the tavern were counterfeit. Huber took the bill she had received to the manager, Paul Porfilio, who also concluded that it was not genuine and partially destroyed it.

Snow also gave Joanne Whitewing, a waitress, a twenty-dollar bill as payment for a drink he had ordered, receiving $18.75 in genuine currency and coins in return. Whitewing also thought the bill Snow had given to her felt unusual and took it to Porfilio, who concluded that it too was counterfeit. At Porfilio's direction, Whitewing returned the twenty-dollar bill to Snow. He then returned the $18.75 change she had given to him and paid for his drink and tip with three "real" one dollar bills.

Snow left Rickey's almost immediately after receiving his change from Whitewing, without finishing his drink. Porfilio telephoned the police, who arrived approximately five minutes later. The police took the three counterfeit twenty-dollar bills

---

1. At trial, Huber could not identify Snow as the patron who had given her the counterfeit twenty-dollar bill. However, she testified that a $20.00 tip was unusually large.

which had been passed at Rickey's that night.[2] Accompanied by Porfilio, they searched for Snow in the vicinity of Rickey's, eventually finding him nearby in another tavern. At the officers' request, Snow accompanied them outside, where he was given "*Miranda*" warnings and arrested on a state criminal charge—theft by trick.

When questioned at the scene about the counterfeit money, Snow responded that he had just sold a used automobile and received the money as payment, but he could state neither the type of automobile he had sold nor its sale price. During a search of Snow's person incident to his arrest, the officers discovered forty-five counterfeit twenty-dollar Federal Reserve Notes in his left front jacket pocket, all bearing the same serial number, which also matched the serial numbers on all the bills passed at Rickey's. In his right front jacket pocket they found an additional counterfeit twenty-dollar bill and sixty dollars in United States currency.

At the police station, Snow again was given "*Miranda*" warnings and questioned. He stated that prior to going to Rickey's he also had received change for a counterfeit twenty-dollar bill at some other tavern in Milwaukee to buy cigarettes. Snow said that on November 6, 1980, the day before the events described above, he had retrieved fifty counterfeit twenty-dollar bills from beneath a rock in Tigerton, Wisconsin. The location of these bills had been shown to him in July, 1980 by someone camping in the area, whom Snow did not identify further. Snow told the detective who was interviewing him that he knew the bills

were counterfeit because they all had the same serial number. At the end of the interview, Snow told the detective that the Government was printing worthless money with which "the working man was getting stuck."[3] He said that he had "stuck" the bank and not the taverns with the counterfeit money he had passed.[4]

The morning after his arrest, Snow was interviewed by a United States Secret Service Agent investigating possible violations of federal counterfeiting laws. During the interview Snow essentially repeated the facts discussed above. Someone from the Police Department already had told the Secret Service agent about Snow's beliefs about the United States' monetary system. The detective told Snow that he did not want to discuss those beliefs with him and stifled Snow's efforts to relate them.

## II.

The single question presented arises out of three evidentiary rulings of the trial court.[5] First, Snow unsuccessfully attempted to cross-examine the Secret Service agent who had interviewed Snow after his arrest about his knowledge of books and other documents espousing the belief that Federal Reserve Notes are worthless and about the agent's experience with people passing counterfeit money holding such a belief.[6] Second, Bruce L. Pagano, a Secret Service counterfeit specialist, testified as to his knowledge of the production of Federal Reserve Notes and his examination of the bills passed and possessed by Snow. Snow unsuccessfully sought to cross-examine Pagano about what happens to Federal Re-

---

**2.** Among these three bills was the one given to Huber which Porfilio had torn and discarded.

**3.** To the arresting officer, Snow had stated, "[I]f Uncle Sam can print it, why can't I." He also said "something to the effect [that] . . . all your money is fake . . . ."

**4.** The detective explained to Snow that this was incorrect because the bank would not credit the taverns' accounts for the counterfeit money.

**5.** Snow does not contest the sufficiency of the evidence. Indeed, we fail to see how such a

contest possibly could have been made in this case.

**6.** On direct examination, the agent had testified:

I didn't want to get into that with him at this time. I knew what his attitude was because the police told me what his attitude was regarding money, and I recall saying to him, I know that some people think our money is no good, I don't want to get into that with you . . . .

serve Notes after they are printed by the Bureau of Engraving and Printing. Finally, the trial court refused to allow Snow to call as a defense witness Dr. Edward E. Popp, author of *The Great Cookie Jar: Taking the Mystery Out of the Money System,* whose testimony would have supported Snow's contention that Federal Reserve Notes are worthless. In all three instances, the trial court concluded that the proffered evidence was irrelevant and, therefore, inadmissible. Snow argues that these rulings were erroneous and require reversal of his convictions.

Snow attacks the foreclosure of the above-described cross-examination under both Rule 401 of the Federal Rules of Evidence and the sixth amendment, which affords criminal defendants the right to confront adverse witnesses. He maintains that the trial court's refusal to admit the proffered testimony of Dr. Popp violated his constitutional right to present witnesses in his defense. The common thread connecting all of these claims is relevancy.[7]

### III.

■ Generally, a criminal defendant may present evidence of, and cross-examine prosecution witnesses regarding, any facts pertinent to his theory of defense. Neither the constitution nor the Federal Rules of Evidence affords a defendant the right either to cross-examine adverse witnesses, or to present defense witnesses to testify, regarding facts which are not "of consequence to the determination of the action...." Fed.R.Evid. 401. It is well settled that in ruling on the relevancy of proffered evidence the trial court has broad discretion which an appellate court will not disturb absent an abuse of it. *E.g., United States v. Bolin,* 514 F.2d 554, 558–59 (7th Cir. 1975). There was no abuse of discretion.

7. Our disposition of this case on other grounds makes it unnecessary for us to consider whether the attempted cross-examination was properly foreclosed as being beyond the scope of the witnesses' testimony on direct examination.

8. Section 472 provides:
Whoever, with intent to defraud, passes, utters, publishes, or sells, or attempts to pass,

Whether the evidence proffered by Snow was relevant depends upon whether the facts whose existence it made more or less probable were "of consequence to the determination of [this] action." Fed.R.Evid. 401.

Relevancy is not an inherent characteristic of any item of evidence but exists only as a relation between an item of evidence and a matter properly provable in the case. Does the item of evidence tend to prove the matter sought to be proved? Whether the relationship exists depends upon principles evolved by experience or science, applied logically to the situation at hand.

Fed.R.Evid. 401 advisory committee notes (citations omitted).

Snow maintains that the alleged fact that Federal Reserve Notes are worthless supported his claim that he passed the counterfeit twenty-dollar bills to expose "the plot" surrounding the United States monetary system. He argues, in turn, that because the purpose of his actions was to make the public aware of the invalidity of Federal Reserve Notes, he lacked the "intent to defraud" required by 18 U.S.C. § 472, the statute under which he was convicted.[8] Thus, he maintains that the proffered evidence was relevant. "As the renowned Dean Roscoe Pound of the Harvard Law School once said to [Senior District Judge Dumbauld of the Western District of Pennsylvania] during a moot-court [sic] case, 'That argument is ingenious but does not hold water.'" *United States v. Payne,* 635 F.2d 643, 645 (7th Cir. 1980), *cert. denied,* 451 U.S. 974, 101 S.Ct. 2050, 68 L.Ed.2d 351 (1981) (Dumbauld, J.).

■■ In jury instructions whose validity Snow does not challenge in this appeal, the trial court stated:

utter, publish or sell, or with like intent brings into the United States or keeps in possession or conceals any falsely made, forged, counterfeited, or altered obligation or other security of the United States, shall be fined not more than $5,000 or imprisoned not more than 15 years, or both.
18 U.S.C. § 472.

To act with intent to defraud means to act with the specific intent to deceive or cheat ordinarily for the purpose of either causing some financial loss to another or bringing about some financial gain to ones [sic] self.

The trial court's definition of "intent to defraud" under § 472 is consistent with the meaning usually ascribed to that phrase by courts construing "intent to defraud" under similar statutes. *E.g., United States v. Diggs,* 613 F.2d 988, 1000 n.67 (D.C.Cir. 1979), *cert. denied,* 446 U.S. 982, 100 S.Ct. 2961, 64 L.Ed.2d 838 (1980) (under 18 U.S.C. § 1341 (mail fraud), act done with fraudulent intent is a knowing and intentional attempt to deceive another); *United States v. Bruce,* 488 F.2d 1224, 1229 (5th Cir. 1973), *cert. denied,* 419 U.S. 825, 95 S.Ct. 41, 42 L.Ed.2d 48 (1974) ("scheme to defraud" under mail fraud statute); *United States v. Biggerstaff,* 383 F.2d 675, 679 n.5 (4th Cir. 1967) ("intent to injure or defraud" under 18 U.S.C. § 1005 (knowingly making false bank entries)); *Cf. Riggs v. United States,* 280 F.2d 750, 752 (5th Cir. 1960) ("intent to defraud" under § 472 same as "intent to pass as true or genuine" under § 473). Thus, although the mere passing of counterfeit currency will not support a conviction under § 472 absent an intent to defraud, *United States v. Kelley,* 186 F.2d 598, 602 (7th Cir.), *cert. denied,* 341 U.S. 954, 71 S.Ct. 1004, 95 L.Ed. 1375 (1951), the Government need not prove that the defendant contemplated the infliction of monetary loss upon the immediate recipient. *Cf. Pina v. United States,* 165 F.2d 890 (9th Cir. 1948) (affirming conviction for altering Treasury check with the forged endorsement of payee with intent to defraud the United States). In examining the sufficiency of the evidence to sustain convictions under § 472, numerous courts have looked to see only whether there was sufficient proof that the defendant passed or possessed Federal Reserve Notes which he knew to be counterfeit. *E.g., United States v. Sloane,* 601 F.2d 800, 803 (5th Cir. 1979); *United States v. Kimbrough,* 481 F.2d 421, 423–24 (5th Cir.), *cert. denied,* 414 U.S. 1114, 94 S.Ct. 845, 38 L.Ed.2d 741 (1973); *United States v. Finnerty,* 470 F.2d 78, 80 (3d Cir. 1972); *United States v. Wolfe,* 307 F.2d 798, 800 (7th Cir.), *cert. denied,* 372 U.S. 945, 83 S.Ct. 938, 9 L.Ed.2d 970 (1962) (defendant gave bills he knew to be counterfeit to third party to be put in circulation).

Under the definition of "intent to defraud" included in the trial court's instructions, which in the current posture of this case we assume to be correct, the proffered cross-examination and defense testimony were irrelevant. The proffered testimony tended to prove the purpose of Snow's acts. However, even if that purpose was not to inflict monetary loss upon another or to cause some financial gain for the defendant, as long as Snow specifically intended to deceive the recipients of the bills he passed § 472 was satisfied. The trial court's instruction states only that the ordinary purpose of an act done with fraudulent intent is to inflict monetary loss upon another or to gain financial advantage for one's self. Thus, Snow's stated purpose—to expose the illegality of our monetary system—was, to say the least, out of the ordinary. Nevertheless, achievement of Snow's stated purpose necessarily required that the recipients of the bills he passed be deceived. He did satisfy the cover charge and gain admission to the tavern with a counterfeit bill and attempted to buy a drink for himself with another counterfeit bill. Otherwise, he could not have been charged with violating § 472. Yet, being so charged was an integral component of Snow's rather unorthodox plan. The resultant criminal proceedings were intended to be Snow's vehicle for disseminating his economic and political theories. Thus, not only was Snow properly foreclosed by the trial court from presenting the proffered evidence, but he achieved his stated goal. The trial court permitted Snow to testify at length regarding his belief that our monetary system is unlawful.

Moreover, "so long as the defendant has the intention required by the definition of the crime, it is immaterial that he may also have had some other intention." W. La Fave & A. Scott, *Criminal Law* 200 (1972).

To put it another way, where, as here, improper motive is not an element of the offense, "evidence which merely relates to his good motive does not tend to disprove [the defendant's] consciousness of wrong doing." *United States v. Cullen*, 454 F.2d 386, 392 (7th Cir. 1971) (Stevens, J.).[9] In this case, even if Snow possessed the motive he professes to have had, he still would be guilty under § 472. Thus, he was properly foreclosed from presenting the proffered evidence, which tended to prove his motive.

We have said in a related context that it may be "impossible to reasonably believe that Federal Reserve Notes are worthless. . . ." *United States v. Moore*, 627 F.2d 830, 833 n.1 (7th Cir. 1980), *cert. denied*, 450 U.S. 916, 101 S.Ct. 1360, 67 L.Ed.2d 342 (1981) (good faith disagreements with a law and good faith belief in its unconstitutionality no defense to prosecution for failing to file income tax return). Under Article I, § 8 of the Constitution, Congress has the power to declare what is legal tender. *United States v. Ware*, 608 F.2d 400, 402 (10th Cir. 1979) (citing cases). Pursuant to that authority, Congress has authorized the issuance of Federal Reserve Notes, 12 U.S.C. § 411, and declared them to be legal tender, 12 U.S.C. § 392, as well as "obligation[s] or other security of the United States." 18 U.S.C. § 8. The fact that Federal Reserve Notes are valued in dollars is a matter of judicial notice. *United States v. Anderson*, 584 F.2d 369, 374 (10th Cir. 1978). Thus, regardless of its relevance, Snow's proffered evidence may have been properly excluded because it went to prove the existence of facts—the illegality and worthlessness of Federal Reserve Notes—the con-

verse of which may be conclusively presumed to exist.

Affirmed.

---

9. Again, in instructions which Snow does not contest in this appeal, the trial court told the jury:

> Now let's not mix up intent and motive. They are two different concepts. And they shouldn't be confused. Motive is what prompts a person to act or fail to act. Intent refers only to the state of mind with which the act is done or omitted. Personal advancement and financial gain are two well recognized motives for much of human conduct. And these are laudable motives and they may prompt one person to voluntary acts of good and another to voluntary acts of

crime. Good motive alone is never a defense where the act done is a crime. So the motive of the accused is immaterial except insofar as evidence of motive may aid you in determining his state of mind or intent.

For the limited purpose for which evidence of motive was admissible under this instruction, the court's allowance of only Snow's testimony on this issue was permissible. *See* Fed.R.Evid. 403. We need not decide whether the trial court properly could have foreclosed Snow from presenting even his own testimony regarding his belief that our monetary system is unlawful.