DUGAN, J.
¶1 Christopher Deshawn McGinnis appeals from a judgment of conviction, following a jury trial, for first-degree intentional homicide with use of a dangerous weapon as a party to a crime, first-degree recklessly endangering safety with use of a dangerous weapon as a party to a crime, and possession of a firearm by a felon. He also appeals the trial court's order denying his postconviction motion.
¶2 McGinnis asserts that the trial court erred by admitting at trial, over the defense's objection, four hearsay statements, and by subsequently denying his postconviction motion for a new trial based on the allegedly erroneous admission of that evidence. McGinnis also asserts a claim of ineffective assistance of trial counsel premised on the failure of trial counsel to adequately object to multiple levels of hearsay in the testimony of two witnesses.
¶3 We are not persuaded that the trial court erred. We conclude that with the exception of one statement, the trial court properly admitted the challenged statements and, that with respect to the one statement, the error was harmless. We also conclude that McGinnis has not established his ineffective assistance of counsel claim. Therefore, we affirm the trial court's judgment and order.
BACKGROUND
The incident and the investigation
¶4 On August 4, 2014, X.A. and his friend Terrell Williams were at a car wash on West Silver Spring Drive and North Teutonia Avenue in Milwaukee, cleaning the interior of X.A.'s vehicle, a blue Ford Expedition. An African-American male wearing a purple hooded sweatshirt with the hood up, later identified as McGinnis, fired a semi-automatic pistol at Williams, who was standing by the open rear passenger side door. McGinnis then ran around the back of the Expedition and shot at X.A. who was standing at the front driver's side door. A bullet pierced X.A.'s left shoe, hitting his foot. After putting Williams in the Expedition, X.A. drove to the hospital, where medical personnel declared Williams dead and treated X.A.
¶5 The shootings were captured on the car wash's video surveillance cameras. The police later obtained those recordings.
¶6 K.N., the driver of a vehicle stopped at a red light at a nearby off-ramp, heard the gunshots and then saw an African-American male run around the corner from where the shots had originated. He was wearing a purple hooded sweatshirt with the hood up and he had one hand in its pocket, as if he was keeping a firearm from falling out. A silver Volkswagen sports utility type vehicle then drove past her, ran the red light, and the man in the sweatshirt entered the Volkswagen. K.N. recorded its license plate number. Soon after that, K.N. called 911, described the incident, and provided the dispatcher with the license plate number for the Volkswagen.
¶7 On August 6, 2014, Milwaukee Police Department Detective Brett Huston, who was investigating the car wash shootings, saw a Volkswagen Touareg with the license plate number provided by K.N. The police arrested McGinnis, who was driving, and his passenger, Dominque Campbell, as suspects in the shootings in this case. The police seized two cellular phones from McGinnis and a cell phone from Campbell.
¶8 McGinnis, whose nickname is "Bede," was held at the Milwaukee County Jail from August 9 until August 11, 2014, and made a number of phone calls that were recorded, as is routine jail practice. During an August 9, 2014 phone call, McGinnis stated that the police thought he was the driver and "Meathead" was the shooter.[1] In an August 11, 2014 call, McGinnis indicated that it was Bede calling and said, "Tell Meathead's girl to shut the fuck up." McGinnis made another phone call, stating that "Little bro' who got shot in the foot is up here," which referred to the fact that X.A. had been placed in the same jail pod as McGinnis.
¶9 On February 27, 2015, the State charged McGinnis with first-degree intentional homicide with use of a dangerous weapon as a party to a crime and possession of a firearm by a felon. Subsequently, the State added a first-degree recklessly endangering safety with use of a dangerous weapon as party to a crime charge.
The trial
¶10 McGinnis filed motions in limine to exclude evidence, including (1) any statement allegedly made by Williams including, but not limited to Williams's alleged statement to Campbell that Williams had "shot up" McGinnis's mother's house; and (2) testimony from X.A. regarding any information provided to him by Williams. After a hearing prior to trial, the trial court orally denied the motions in limine.
¶11 The jury trial lasted six days. The State's theory of the case was that McGinnis shot Williams as revenge because Williams had used counterfeit money to buy drugs from him, and because Williams had also fired shots into McGinnis's mother's house in April 2014. The defense's theory was that "the State had charged the wrong person."
¶12 The jury saw a video of the shootings captured by the car wash surveillance cameras, which showed Williams and X.A. vacuuming the Expedition when a silver Volkswagen Touareg entered the car wash and "slowly drove by the location where [Williams and X.A.] were at the vacuum pumps." The Volkswagen then went through the car wash and left, heading north. Approximately three minutes later, the shooter, a dark figure in a purple hooded sweatshirt, walked onto the car wash lot from the north. The shooter walked quickly, pulled out a gun, and then ran quickly up to the Expedition's rear passenger side door, and when he was a couple of feet away, fired numerous gunshots at Williams. The shooter then ran around the back of the Expedition and fired additional shots at X.A. The shooter ran southbound on Teutonia Avenue towards Silver Spring Drive, in the same direction that the Volkswagen had been moving very slowly a minute or two earlier. The jury also heard the recordings of the phone calls that McGinnis made from the jail.
¶13 In addition, the jury heard the testimony of eighteen witnesses, including K.N. K.N. testified about what she observed on August 4, 2014, as summarized above. In court, K.N. identified McGinnis as the man she saw running from the area where the gunshots were heard, and said she was "[a] million percent positive" about it.
¶14 Lieutenant Eric Donaldson testified about the cell phones that Huston seized from McGinnis. He testified that data obtained from one of McGinnis's cell phones established that the phone was in the general area of the homicide scene-on the date and at the time of the shooting.
¶15 Five witnesses testified about the animosity between McGinnis and Williams: X.A.; Campbell, the vehicle passenger when McGinnis was arrested; Bria Templer, Campbell's girlfriend; Detective Luke O'Day, who interviewed Campbell and Templer; and Orlando Walker, who recounted the statements that McGinnis had made to him. We discuss the details of these statements below.
¶16 The jury returned guilty verdicts on the three counts. The trial court sentenced McGinnis to a global sentence of life with eligibility for release to extended supervision after serving twenty-seven years.
Postconviction proceedings
¶17 McGinnis filed a postconviction motion which raised the evidentiary issues and the ineffective assistance of counsel claim that he pursues on appeal.[2] The trial court conducted a Machner hearing during which trial counsel testified.[3]
¶18 In a written order denying the postconviction motion, the trial court reaffirmed its evidentiary rulings, and also held that even if all of its initial evidentiary rulings concerning X.A. and Campbell's testimony were incorrect, the errors would be harmless because the information concerning the drug deal and the shooting was otherwise properly admitted at trial in other ways, most notably from Templer and Walker. The trial court also found that trial counsel objected to the motive evidence before trial and at trial, and that clearly all parties and the court were aware of McGinnis's position on the evidence, and that "trial counsel represented ... McGinnis well." Moreover, the trial court stated that the video recording of the shootings showing McGinnis's distinctive gait and K.N's in-court identification of McGinnis were the "gravamen" of the case. It also stated that based on that evidence, there was "no chance" of a different outcome.
¶19 This appeal followed.
DISCUSSION
¶20 On appeal, McGinnis contends that the trial court erred in admitting four hearsay statements at trial. He also contends that trial counsel provided ineffective assistance to the extent that trial counsel failed to adequately object to multiple levels of hearsay in the testimony of two witnesses.
I. The standards of review and applicable law
The standards of review for admission of hearsay evidence
¶21 Generally, "[a] trial court's decision to admit a hearsay statement is a discretionary one, and we will not reverse the trial court's decision unless the record shows that the ruling was manifestly wrong and an erroneous exercise of discretion." See State v. Hale , 2003 WI App 238, ¶12, 268 Wis. 2d 171, 672 N.W.2d 130. However, whether a statement is admissible under a hearsay exception is a question of law that we review de novo. See State v. Joyner , 2002 WI App 250, ¶16, 258 Wis. 2d 249, 653 N.W.2d 290.
¶22 "Under the erroneous exercise of discretion standard, 'the [trial] court's determination will be upheld on appeal if it is a reasonable conclusion, based upon a consideration of the appropriate law and facts of record.' " State v. Salas Gayton , 2016 WI 58, ¶20, 370 Wis. 2d 264, 882 N.W.2d 459 (citation omitted). The factual findings made by the trial court are accepted on appeal unless they are clearly erroneous. See State v. Baldwin , 2010 WI App 162, ¶30, 330 Wis. 2d 500, 794 N.W.2d 769.
¶23 A trial court's erroneous exercise of discretion in admitting evidence is subject to the harmless error rule. State v. Harris , 2008 WI 15, ¶85, 307 Wis. 2d 555, 745 N.W.2d 397. Whether the error was harmless presents a question of law that this court reviews de novo. See State v. Jackson , 2014 WI 4, ¶44, 352 Wis. 2d 249, 841 N.W.2d 791.
Hearsay and the statement against interest exception
¶24 Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." WIS. STAT. § 908.01(3) (2017-18).[4] In general, hearsay evidence is inadmissible; however, there are statutory exceptions to this general rule. See WIS. STAT. § 908.02.
¶25 One exception to the hearsay rule is the admission of an unavailable declarant's statement against his or her interest. See WIS. STAT. § 908.045(4). "Hearsay statements that are against an unavailable declarant's interest are admissible as an exception to the hearsay rule." Joyner , 258 Wis. 2d 249, ¶15.
Prior inconsistent statements
¶26 A prior inconsistent statement of a witness is admissible at trial if the declarant testifies at the trial and is subject to cross-examination concerning the statement, and the statement is inconsistent with the declarant's testimony. WIS. STAT. § 908.01(4)(a)1. Such a statement is not hearsay. Id. "[W]here a witness denies recollection of a prior statement, and where the trial judge has reason to doubt the good faith of such denial, [the judge] may in [his or her] discretion declare such testimony inconsistent and permit the prior statement's admission into evidence." State v. Lenarchick , 74 Wis. 2d 425, 436, 247 N.W.2d 80 (1976).
The standard for pleading a claim of ineffective assistance of counsel
¶27 Wisconsin courts apply the United States Supreme Court's two-pronged Strickland v. Washington , 466 U.S. 668 (1984), test to analyze claims of ineffective assistance of counsel in criminal cases. State v. Williams , 2015 WI 75, ¶74, 364 Wis. 2d 126, 867 N.W.2d 736. "To prevail under Strickland , a defendant must prove that counsel's representation was both deficient and prejudicial." Williams , 364 Wis. 2d 126, ¶74.
¶28 The standard of review of the ineffective assistance of counsel components, deficient performance and prejudice, presents a mixed question of law and fact. State v. Johnson , 153 Wis. 2d 121, 127, 449 N.W.2d 845 (1990). "Thus, the trial court's findings of fact, 'the underlying findings of what happened,' will not be overturned unless clearly erroneous." Id. (citations omitted). "The ultimate determination of whether counsel's performance was deficient and prejudicial to the defense are questions of law which this court reviews independently." See id. at 128. "[C]ourts may reverse the order of the two tests or avoid the deficient performance analysis altogether if the defendant has failed to show prejudice." Id.
II. The trial court properly admitted three of the alleged hearsay statements and the admission of the fourth statement was harmless error
A. X.A.'s testimony about what Williams told him is admissible under the hearsay exception for statements against penal interest
¶29 McGinnis asserts that the trial court erred as a matter of law, when it determined that "[X.A.'s] testimony that Williams told him ... that Williams had shot up McGinnis's mother's house and had paid McGinnis in counterfeit money," which was hearsay, was admissible under WIS. STAT. § 908.045(4).
¶30 WISCONSIN STAT. § 908.045(4) provides in relevant part that "[t]he following [is] not excluded by the hearsay rule if the declarant is unavailable as a witness:"
Statement against interest. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability or to render invalid a claim by the declarant against another or to make the declarant an object of hatred, ridicule, or disgrace, that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true.
(Italics added.) To be a statement against interest, the statement must inculpate the declarant. See Joyner , 258 Wis. 2d 249, ¶20. "The exception for statements against interest is based on the assumption that people do not make statements that are damaging to themselves unless they have a good reason to believe that those statements are true." Id. , ¶15.
¶31 McGinnis argues that
[i]n assessing whether Williams's statements "so far" tended to subject him to criminal liability or to make him "an object of hatred, ridicule, or disgrace," that a reasonable person in Williams's position "would not have made the statement unless the person believed it to be true," WIS. STAT. § 908.045(4), this [c]ourt therefore should consider whether the circumstances were such that Williams was unlikely to lie, whether fear of punishment or easy detection of lies probably would have counteracted any motive to lie, and how public the statement was.
¶32 McGinnis asserts that State v. Stevens , 171 Wis. 2d 106, 490 N.W.2d 753 (Ct. App. 1992), supports his contention. He argues that Stevens "establishes both that the social context matters greatly in determining whether there is sufficient trustworthiness to admit a statement under the social interest exception and that the declarant's perceptions of the social risks of his or her statement matter." (Emphasis added.) He correctly notes that in Stevens this court explained that "there is both an objective and a subjective pole to the social interest exception. The objective pole is the determination that the declarant actually faced a risk of hatred, ridicule or disgrace. The subjective pole concerns the declarant's appreciation of the risk of hatred, ridicule or disgrace." Id. at 114 (emphasis added). McGinnis then asserts that this court's holding in Stevens applies to not only the social interest exception, but also to the penal interest exception.[5]
¶33 We are not persuaded by McGinnis's argument. First, he cites no legal authority for his argument. Further, in his reply brief, McGinnis first appears to no longer argue that there is a subjective pole to the penal interest exception and merely argues that a reasonable person in Williams's position would only make the statement if he believed it to be true. However, he then argues that Williams "had no subjective fear of punishment or detection, and, most important, that [Williams] likely made the statement to create admiration for [Williams]." (Emphasis added.) Thus, while declaring that he is only arguing the reasonable person standard, McGinnis continues to argue a subjective pole to the penal interest exception, without authority. Therefore, we decline to further consider this assertion. See State v. Pettit , 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992).
¶34 Moreover, even if we were to consider the argument, the holding in Stevens is clearly limited to the social interest exception. This court noted that Wisconsin is one of only ten states or territories that recognize the social interest category of statements against interest. See id. , 171 Wis. 2d at 112. We also noted that the exception would swallow the rule if hearsay testimony could be admitted whenever the declarant faces social disapproval simply by making an accusation. See id. at 117. Most significantly, this court specifically concluded that, although the statements involved in the case were not admissible under the social interest exception, they would have been admissible under the penal interest exception. This court stated:
Here, Melissa's hearsay statement reported her stepfather's burglary and theft of stereo equipment. Melissa was not involved in the burglary. Furthermore, if Melissa had been involved in her stepfather's actions, her statement would have come under the penal interest exception rather than the social interest exception because burglary has penal consequences.
Id. at 118. Here, Williams's statement tended to subject him to criminal liability arising from the shooting up of McGinnis's mother's home and buying drugs with counterfeit money.
¶35 We conclude that the trial court properly determined that Williams's statement was admissible as a statement against penal interest. It is uncontroverted that the deceased declarant Williams is unavailable. See WIS. STAT. § 908.04(1)(d). Williams inculpated himself in criminal activity by stating that he had shot at a house and purchased drugs with counterfeit money. See State v. Buelow , 122 Wis. 2d 465, 476-77, 363 N.W.2d 255 (Ct. App. 1984) (stating that a statement qualifies as a statement against interest when the declarant admits "active participation" in criminal activity). Shooting at a house constitutes criminal activity. See State v. Grady , 175 Wis. 2d 553, 556, 499 N.W.2d 285 (Ct. App. 1993) (stating that WIS. STAT. § 941.20(2)(a) makes it a Class E felony for any person to intentionally discharge "a firearm into vehicle or building under circumstances in which he should realize there might be a human being present therein"). Passing counterfeit currency and purchasing controlled substances are also criminal offenses. See United States v. Snow , 670 F.2d 749, 753-54 (7th Cir. 1982) (upholding conviction under 18 U.S.C. § 472 for passing and possessing counterfeit currency); WIS. STAT. § 961.41(3g) (regarding possession of various controlled substances). We also conclude that as a matter of law, the trial court reasonably concluded that a reasonable person in Williams's position would not make statements admitting to such criminal conduct unless they were true.
B. Detective O'Day's testimony about Templer's statement that Campbell told her that McGinnis told him were admissible as Campbell's prior inconsistent statements
¶36 McGinnis maintains that the trial court erroneously admitted Detective O'Day's testimony that Templer, Campbell's girlfriend, told him that Campbell said that McGinnis told him that Williams's homicide "was related to the shots fired into ... McGinnis's mother's house." McGinnis asserts that what Campbell told Templer is not a prior inconsistent statement because the State never directly asked Campbell about McGinnis's motive for the shooting.
Campbell's testimony at trial
¶37 On direct examination, the prosecutor asked Campbell, "Did you have knowledge of an ongoing problem that [McGinnis] was having with a person named ... Williams?" Campbell answered, "Not that I know of." The prosecutor then asked, "So you didn't have any knowledge of any kind of dispute that existed between [McGinnis] and someone named [Williams]?" Campbell responded, "Not that I know of." In other words, Campbell disavowed any knowledge that there was a disagreement between McGinnis and Williams.
¶38 Campbell also testified that McGinnis told him that he had "gotten it done" and that he shot somebody in the foot. He also testified that he could not recall if McGinnis told him that he had shot Williams and could not recall telling detectives that McGinnis indicated that he shot Williams. Campbell also testified that he could not recall telling Detective O'Day that McGinnis told him how the shooting occurred.
Prior inconsistent statement
¶39 Campbell's trial testimony that he did not know of any problem or dispute between McGinnis and Williams was inconsistent with Campbell's prior statement to Templer that McGinnis told him that the homicide was related to the shots fired into McGinnis's mother's house. There was no need for the prosecutor to have explicitly asked Campbell whether McGinnis was angry about the shooting of his mother's house in order for Campbell's trial testimony to have been inconsistent with his prior statement to Templer that McGinnis told him the homicide was related to shots fired into McGinnis's mother's house. Campbell's trial testimony, to the effect that he knew nothing of any ongoing problem or dispute between McGinnis and Williams, was entirely inconsistent with what he told Templer.
C. Templer's statement about what Campbell told her McGinnis said to him was admissible as Campbell's prior inconsistent statement
¶40 McGinnis also argues that the trial court erred in admitting Templer's statement that Campbell told her that he heard that "the reason for the shooting and killing [Williams] was because [Williams] had shot up [McGinnis's] mother's house." He asserts that what unspecified people told Campbell is inadmissible hearsay.
¶41 McGinnis argues that Templer testified that Campbell told her that unspecified people told him that the reason for the shooting was because Williams shot up McGinnis's mother's house. He asserts that Templer never testified that the information came from McGinnis.
Inconsistent statement
¶42 McGinnis's assertion is not supported by the record. The question and the answer set forth below establish that Templer did testify that Campbell told her that McGinnis told him that his reason for shooting and killing Williams was because Williams had shot up McGinnis's mother's house. The prosecutor asked Templer, "Did [Campbell] tell you that [McGinnis] told [him] and, in fact, that [McGinnis] was telling everybody that the reason for shooting and killing [Williams] was because [Williams] shot up [McGinnis's] mom's house?" Templer's answer to that question was, "I heard-I mean he heard, yeah. He told me that he heard that." The nature of the question and the answer does not reflect that some unspecified people told Campbell, it was McGinnis who told Campbell.
¶43 Again, McGinnis argues that it was not inconsistent. However, as previously explained, it was. Therefore, Templer's statement about what Campbell told her McGinnis said to him was admissible as Campbell's prior inconsistent statement.
D. Detective O'Day's testimony that Campbell told him that there were people who had stated that Williams shot into McGinnis's mother's house was hearsay but its admission was harmless
¶44 McGinnis also maintains that Detective O'Day's testimony about what Campbell stated to him during an interview was inadmissible hearsay. Detective O'Day testified that Campbell told him that "four or five months previous to this homicide ... McGinnis's mother's house was shot into. There were people who stated that ... Williams was a person who had driven up in his vehicle and shot into the house." We conclude that the statement about "people who stated" that Williams drove up to McGinnis's mother's house and shot into it is clearly hearsay, and there is no exception for "people" who made the statement.
Admission of the statement was harmless error
¶45 When analyzing whether the erroneous admission of evidence is harmless, factors that we may consider include, but are not limited to:
the frequency of the error, the importance of the erroneously admitted evidence, the presence or absence of evidence corroborating or contradicting the erroneously admitted evidence, whether the erroneously admitted evidence duplicates untainted evidence, the nature of the defense, the nature of the State's case, and the overall strength of the State's case.
See Harris , 307 Wis. 2d 555, ¶45.
¶46 As discussed, Templer testified that Campbell told her that McGinnis told him the shooting was related to Williams shooting into his mother's house. Also, Walker testified that McGinnis told him that a guy had ripped him off by giving him counterfeit money for marijuana and that when McGinnis called the guy that ripped him off and told him he needed his money, the guy shot up McGinnis's mother's house a few days later. Walker further testified that McGinnis said he was really mad about the house shooting and was looking for the shooter. Here, the testimony regarding Williams being the person who shot into McGinnis's mother's house was duplicated and corroborated through the untainted testimony of other witnesses, including Templer and Walker. Moreover, the jury could also consider such evidence, which supported the State's theory that the shooting was motivated by McGinnis's quest for revenge against Williams, along with McGinnis's defense that the State had charged the wrong person.
¶47 Additionally, the State's case was overwhelming. At trial, K.N. testified and identified McGinnis as the man she saw running from where the sounds of gunfire were coming and that she was "a million percent" positive that he was the one. Several witnesses also testified that McGinnis confessed to murdering Williams and wounding X.A. There was also video surveillance evidence that the trial court found compelling, the jail calls, and cell phone geolocation evidence, all of which implicated McGinnis.
¶48 For the foregoing reasons, we conclude that it is clear "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained" or, as the test has been alternatively worded, that it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." See id. , ¶¶42-43 (citations omitted).
III. Trial counsel provided effective assistance
¶49 McGinnis's claim that trial counsel failed to provide effective representation is conditioned upon a finding that trial counsel failed to adequately object to the layers of hearsay. However, the trial court found that trial counsel provided effective representation and that finding is supported by the record and, therefore, is not clearly erroneous. Moreover, we have concluded that all but one of the hearsay statements was admissible and the admission of the remaining hearsay statement was harmless. See State v. Jacobsen , 2014 WI App 13, ¶49, 352 Wis. 2d 409, 842 N.W.2d 365 (stating that counsel does not perform deficiently by failing to make a losing argument).
CONCLUSION
¶50 We conclude that except for the erroneous admission of a statement which was harmless, the trial court properly admitted the challenged statements. We also conclude that McGinnis has not established his ineffective assistance of counsel claim. Therefore, we affirm the trial court's judgment and order.
By the Court. -Judgment and order affirmed.
Not recommended for publication in the official reports.

Campbell is also known as "Meathead."

On appeal, McGinnis does not pursue any of the other issues that he presented in his postconviction motion.

See State v. Machner , 92 Wis. 2d 797, 804, 285 N.W.2d 905 (Ct. App. 1979).

All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

McGinnis makes this argument because neither the State, nor the trial court, relied on the social interest exception-they relied on the penal interest exception.