STATE of Wisconsin,
Plaintiff-Respondent,

v.

Scottie L. BALDWIN,
Defendant-Appellant.†

Court of Appeals

*Nos. 2009AP1540–CR, 2009AP1541–CR, 2009AP1542–CR, 2009AP1543–CR. Submitted on briefs August 3, 2010. —Decided November 2, 2010.*

2010 WI App 162

(Also reported in 794 N.W.2d 769.)

† Petition for Review filed.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Robert E. Haney*, Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *J.B. Van Hollen*, attorney general, and *Aaron R. O'Neil*, assistant attorney general.

Before Curley, P.J., Fine and Brennan, JJ.

¶ 1. BRENNAN, J. Scottie L. Baldwin appeals two evidentiary rulings entered on the first day of his jury trial and the imposition of a DNA surcharge at sentencing.[1] First, he argues that the trial court violated the Sixth Amendment's Confrontation Clause by admitting statements made by Baldwin's girlfriend, R.Z., under the

---

[1] Baldwin appeals judgments of conviction entered in four Milwaukee County Circuit Court Cases: Nos. 2007CM1803, 2007CM2031, 2007CF2984 and 2007CF3514. The trial court consolidated the cases but entered four separate judgments.

forfeiture by wrongdoing exception to the general prohibition against hearsay. Baldwin contends that the record fails to support the trial court's finding that R.Z. was unavailable for trial and that the trial court applied "bad law." Second, Baldwin argues that the trial court erred by admitting tape recordings of telephone conversations without authenticating them as required by WIS. STAT. § 909.015. Finally, he argues that the trial court's imposition of the DNA surcharge offends *State v. Cherry*, 2008 WI App 80, 312 Wis. 2d 203, 752 N.W.2d 393.

¶ 2.    We reject Baldwin's arguments and affirm because the trial court made the requisite findings under *Giles v. California*, 554 U.S. 353, 128 S. Ct. 2678 (2008), to establish forfeiture by wrongdoing and the record reveals sufficient authentication for the telephone recordings under WIS. STAT. § 909.015 and *State v. Williams*, 2002 WI 58, 253 Wis. 2d 99, 644 N.W.2d 919. We also conclude that we lack jurisdiction over Baldwin's *Cherry* claim because he never filed a notice of appeal from the trial court's July 31, 2009 order denying his *pro se* postconviction motion to vacate the DNA surcharge.

## BACKGROUND

### I. Prior Dismissed Cases Relevant to Appeal

¶ 3.    Baldwin and R.Z. were engaged in a violent relationship that resulted in much police and court

involvement. The first charges relevant to Baldwin's claims on appeal were multiple charges of domestic violence brought against Baldwin in 2005 and 2006 for harming R.Z.[2] Those charges were eventually dismissed without prejudice when R.Z. failed to appear at trial.

## II. First Case Consolidated on Appeal: Case No. 2007CM1803

¶ 4.  On March 13, 2007, Baldwin was charged in Milwaukee County Circuit Court Case No. 2007CM1803, the first case consolidated on appeal, with disorderly conduct, as a habitual criminal, for threatening to harm R.Z. several days earlier. According to the criminal complaint, R.Z., who was two months pregnant with Baldwin's child at the time, told police that Baldwin was "yelling and screaming and threatening to kill her" and that he "punched the walls and yelled, 'you're going to fucking get it[]' and 'I'm going to dog walk your ass and blacken your eye.' " R.Z. told police that she was "really scared" because Baldwin "ha[d] hit her and threatened her on prior occasions." The responding police officer noted that R.Z. "appeared nervous, fearful and [was] shaking." As a condition of Baldwin's bail, the trial court prohibited Baldwin from contacting R.Z. and from committing any new crimes.

## III. Second Case Consolidated on Appeal: Case No. 2007CM2031

¶ 5.  Ten days later, while Baldwin was out on bail for the March 2007 incident, he was charged with

---

[2] More specifically, Baldwin was charged in Milwaukee County Circuit Court Case Nos. 2005CM5163, 2005CM7326 and 2006CM299.

misdemeanor bail jumping for failing to appear in court for a hearing on one of the dismissed 2005 charges.[3] The bail jumping charge constitutes Milwaukee County Circuit Court Case No. 2007CM2031 and is the second case consolidated on appeal. Again, as a condition of his bail, Baldwin was ordered not to commit any new crimes.

## IV. Third Case Consolidated on Appeal: Case No. 2007CF2984

¶ 6.  On June 14, 2007, Baldwin was charged with aggravated battery and false imprisonment, both felonies, in the third case consolidated on appeal, Milwaukee County Circuit Court Case No. 2007CF2984. According to the criminal complaint, R.Z. told police that Baldwin "battered her unmercifully and struck her with a great amount of force" and that as a result of the attacks R.Z.:

> suffered serious bodily injuries . . . including, but not necessarily limited to[:] two black eyes, substantial swelling to the orbital area of each eye and the upper forehead, apparent blood on the surface of her eyes, significant discoloration of the whites of each eye, temporary impairment of her vision, significant pain, bruising, redness, and discoloration, various abrasions to the facial area and a substantial goose-egg like swollen bump to her upper forehead above the right eye.

After Baldwin refused to let R.Z. leave an upstairs bedroom for over two hours, she was able to escape to her sister's house while Baldwin slept.

---

[3] More specifically, Baldwin was charged with bail jumping in Case No. 2005CM5163.

¶ 7. Additionally, Baldwin was charged with four counts of bail jumping for violating the conditions of his bail in Case Nos. 2007CM1803 and 2007CM2031. Each count charged the habitual criminality enhancer based on Baldwin's previous convictions.

¶ 8. Because Case No. 2007CF2984 charged Baldwin with felonies, the trial court was required to hold a preliminary hearing. The State served R.Z. with a subpoena for the June 21, 2007 preliminary hearing. R.Z. failed to appear. The preliminary hearing was adjourned to June 26, 2007, but again R.Z. failed to appear. Soon thereafter, the trial court received a letter from R.Z., dated June 20, 2007, in which she stated that she would not appear or testify, that she suffered from bipolar disorder and that she was not taking her medications. More specifically, the letter stated:

> To whom it may concern:
>
> I called my baby's father, Scottie Baldwin, three or four times before he picked up his cell phone in the early morning hours. I was trying to inform him that I had a fight in the club and that I had needed his help because some girl and a boyfriend had jumped on me. Scottie came about thirty minutes after the altercation had went on. He was asking me why did I go out to the club while pregnant with his child. I started to get upset and I really didn't want to go back to the club and confront them. I called the cops about three or four hours after and informed them that Scottie did it to me. I did not take my medication that morning. I have been diagnosed with bipolar disease. I refuse to come to court knowing that I lied lied [sic] on Scottie. Sorry for the inconvenience.[4]

---

[4] The record we received on appeal did not contain R.Z.'s June 20, 2007 letter to the trial court. However, the contents of the letter were read into evidence during the August 2 and 3,

Without R.Z.'s testimony, the State could not proceed with the felony charges against Baldwin. Accordingly, the State amended one of the felony counts to a misdemeanor and the trial court dismissed the second count without prejudice.

## V. Fourth Case Consolidated on Appeal: Case No. 2007CF3514

¶ 9.  After R.Z. failed to appear in court on June 21 and 26, 2007, the State obtained a search warrant to search R.Z.'s residence. Police found written correspondence in the residence sent to R.Z. from Baldwin while he was at the Milwaukee County Jail. A card from Baldwin, dated June 20, 2007, and found in R.Z.'s bedroom, told R.Z. to tell the trial court that she would not come to the preliminary hearing and testify. The card stated:

> Call Judge Conen, Branch 30, and tell him about the bipolar situation. And he is the one that put a body warrant for you out before and you went out of town. Until you drop it, you planning to go out of town. If they put a body warrant out again, tell them you didn't take your medication that day and shit like this that happened before, and you're not coming to court no matter what. Leave the judge your number in case he want to call and verify it. Call at about 8 o'clock in the morning Thursday. I love you. Everlasting love on my mama. Everything is going to be all right. Papi.[5]

2007 preliminary hearing in Case No. 2007CF3514. Because the parties do not argue over the letter's existence or over whether the transcript from the August 2 and 3, 2007 preliminary hearing accurately reflects the contents of the letter, we accept that transcript as an accurate recitation of the letter's contents.

[5] Again, the letter itself was not included in the record on appeal. Because the parties appear to agree that the card exists

¶ 10. Approximately one month after R.Z. failed to appear at the preliminary hearing in Case No. 2007CF2984, the State filed the complaint in the fourth case consolidated on appeal, Case No. 2007CF3514. After filing an amended information, the State charged Baldwin with seven counts.

¶ 11. The first count, intimidation of a witness, a felony, alleged that Baldwin intimidated R.Z. from appearing and testifying at the June 21 and 26, 2007 preliminary hearing dates in Case No. 2007CF2984. The allegations were based on: the June 20, 2007 card from Baldwin to R.Z. found in R.Z.'s residence; R.Z.'s June 20, 2007 letter to the trial court; and Baldwin's subsequent failure to appear at the June 21 and 26, 2007 preliminary hearing dates.

¶ 12. Counts two through four—charging disorderly conduct, criminal damage to property and battery —were based on an August 5, 2005 incident in which R.Z. told police that Baldwin hit her with his fists, struck her with an ironing board and threw a glass candlestick holder at her. Baldwin then took R.Z.'s car keys and cell phone and drove her car into the screen door of R.Z.'s house.

¶ 13. Count five, disorderly conduct, was based on a January 13, 2006 incident in which R.Z. told police that she had run outside because Baldwin had been threatening her and chasing her and she feared for her safety. Once outside, Baldwin pushed R.Z.'s face into the mud and pushed and struck R.Z.'s five-year-old son when he attempted to intervene.

¶ 14. Counts six and seven, two misdemeanor counts of intimidating a witness, were based on addi-

and that the recitation of the card's content during the August 2 and 3, 2007 preliminary hearing is accurate, we accept that recitation as true.

tional correspondence police recovered during the search of R.Z.'s residence. Baldwin sent the correspondence to R.Z. in 2005 and 2006, dissuading her from attending and testifying in court in several then-pending, domestic violence cases.[6]

## VI. August 2 and 3, 2007 Preliminary Hearing

¶ 15. The preliminary hearing in Case No. 2007CF3514 was held on August 2 and 3, 2007. Milwaukee County Deputy Sheriff James Urban and Milwaukee Police Department victim liaison Kara Garcia testified. The exhibits received at the preliminary hearing included:   the June 20, 2007 card Baldwin sent R.Z. from jail, Milwaukee County Jail records, Milwaukee Police Department voice mail recordings and two recordings of telephone calls Baldwin made from jail to R.Z.

¶ 16. Deputy Urban testified that Milwaukee County Jail recordings showed that telephone calls were placed to (414) 588-4372 from "pods" that Baldwin had been assigned to at the Milwaukee County Jail, at times that Baldwin was assigned to the pods. Additionally, Deputy Urban testified that exhibit 12 was a tape recording of a call made from Baldwin's pod on June 20, 2007, to (414) 588-4372. Detective Urban also testified that the jail log showed that on June 17 and June 20, 2007, Baldwin sent mail correspondence to 1208 South 7th Street, Milwaukee and that the correspondence displayed Baldwin's name as part of the return address.

¶ 17. Garcia testified that she was assigned to be R.Z.'s liaison. She testified that exhibit 11 was a tape recording of a voice message left by R.Z. on Garcia's

---

[6] Specifically, the complaint charged that Baldwin intimidated R.Z. and prevented her from testifying in Case Nos. 2005CM7326 and 2006CM299.

telephone. The tape recording was played and Garcia identified R.Z.'s voice. Garcia testified that exhibit 6 was an accurate transcript of exhibit 11, and in it, R.Z. told Garcia to call R.Z. at (414) 588–4372, the same number Deputy Urban identified had been called from the pod in which Baldwin was located at the Milwaukee County Jail. Garcia testified that she called R.Z. at that number and spoke to R.Z. Garcia also testified that the voice on exhibit 12, the tape recording of Baldwin's call from jail, was R.Z.'s voice. Garcia testified that she had heard R.Z. speak in person and talked to her over the telephone at least seven or eight times.

¶ 18. Garcia also testified that she was present during the execution of the search warrant at 1208 South 7th Street, R.Z.'s home. She identified exhibit 3–A as an envelope from the Criminal Justice Facility bearing Baldwin's name and postmarked June 20, 2007. She identified exhibit 3–B as the card that the police recovered from R.Z.'s bedroom during the execution of the search warrant. Garcia read the card into the record, in which Baldwin instructs R.Z. to write a letter to the trial court judge and to tell the judge that she would not testify.

¶ 19. Following the preliminary hearing, the trial court found that the telephone calls and writings were admissible and found probable cause existed on which to charge Baldwin with intimidating a witness, i.e., intimidating R.Z. from appearing at the June 20 and 26, 2007 preliminary hearing in Case No. 2007CF2984. The trial court bound Baldwin over for trial, rescinded all of Baldwin's telephone, mail and visitation privileges, and consolidated all four pending cases for trial.

## VII. Motion to Admit Hearsay Evidence under the Forfeiture by Wrongdoing Doctrine

¶ 20.   In August 2007, the State filed a motion asking the trial court to admit into evidence, under the forfeiture by wrongdoing doctrine, R.Z.'s statements to the police about what Baldwin did to her. In its motion, the State incorporated the records of all four of Baldwin's pending cases, including all of the exhibits from the August 2 and 3, 2007 preliminary hearing and the writings recovered from the search of R.Z.'s home. The trial court did not rule on this motion until April 14, 2008, the first day of the jury trial.

## VIII. Pretrial Proceedings

¶ 21.   On January 7, 2008, the date on which the jury trial was set to begin, the State filed a written motion for an adjournment because new information had been brought to the State's attention, requiring additional time to prepare. More specifically, the State's motion stated that despite the trial court's August 3, 2007 order that Baldwin be denied telephone, mail and visitation privileges, and despite the trial court's order that Baldwin have no contact with R.Z., the State had learned that Baldwin had purchased and used telephone calling cards and had utilized the assistance of third parties to call R.Z. from jail. The State claimed to have first received recordings of these calls, dozens of hours in length, on January 4, 2008. The State had listened to them and notified defense counsel of their contents.

¶ 22.   The State also alleged that in one call, made on November 28, 2007, Baldwin's jail podmate, called a telephone number, which then connected R.Z. in a

512

three-way telephone call. The State claimed that on the recording of the telephone call, Baldwin is heard instructing his podmate to tell R.Z. to draft a notarized statement that day to give to the trial court, telling the court that she would not appear and testify at the January 7, 2008 trial date. In the call, Baldwin instructed R.Z. to get the notarized statement to his trial attorney. R.Z. said she would do it.

¶ 23. On December 10, 2007, the court received a notarized statement, submitted by Baldwin's attorney, signed by R.Z. and dated November 28, 2007, in which R.Z. said she would not appear or testify:

> Dear Attorney Mr. Shikora, I looked on the computer and seen that the State of Wisconsin is charging Scottie L. Baldwin with intimidation of a witness. If that charge is because of me, I am writing this to tell you that Scottie L. Baldwin is not intimidating me at all. Sincerely, R[.]Z[.[7]]

Consistent with her November 28, 2007 notarized statement, R.Z. failed to appear for trial on January 7, 2008, even though the State informed the trial court that R.Z. had been successfully served.

¶ 24. On April 10, 2008, the State filed a brief in an attempt to authenticate the recordings of the telephone calls Baldwin made to R.Z. from the Milwaukee County Jail in violation of the trial court's August 3, 2007 order. In support of its brief, the State attached transcripts of the twelve telephone calls.

---

[7] Once more, the actual statement is not in the record before this court. We accept as true the recitation of the statement in the record at the January 7, 2008 hearing on the State's motion for adjournment because the parties appear to agree that the recitation of the statement is an accurate one.

## IX. Evidentiary Rulings

¶ 25. The trial court, on April 14, 2008, made two evidentiary rulings based on: the State's attachments to its motions, the August 2 and 3, 2007 preliminary hearing testimony and corresponding exhibits, and the procedural history and pleadings in the pending domestic violence cases.[8]

¶ 26. First, the trial court found that the telephone recordings were admissible over trial defense counsel's objection as to foundation under Wis. Stat. § 909.015 because the State's witnesses had sufficiently identified R.Z.'s voice in the recordings and had linked the calls to Baldwin through his jail pod assignments. The court also found that the details in the telephone calls and correspondence found in R.Z.'s residence were so specific that they would have been familiar only to Baldwin and R.Z., and therefore that they established the proper foundation.[9]

¶ 27. Second, the trial court found that R.Z.'s statements to the police were admissible under the forfeiture by wrongdoing doctrine. The trial court based its ruling on its finding that R.Z. was unavailable for trial and that the State had shown, by a preponderance of the evidence, that Baldwin had "intimidated the

---

[8] Baldwin has not argued, either before the trial court or before this court, that the trial court based its rulings on insufficient evidence.

[9] Defense counsel did not challenge the accuracy of the transcripts, agreeing with the trial court that the content of the transcripts accurately reflected the recordings. ("Q: So, with respect to the recordings, you believe they [transcripts] accurately portrayed what's stated on those tapes? A: I believe so.").

514

State's witness R[.]Z[.], from attending court to testify against him [Baldwin] at trial."

## X. Sentencing

¶ 28.   The jury trial proceeded without R.Z. Baldwin was found guilty of all counts, except for one count of criminal damage to property. On June 19, 2008, Baldwin was sentenced.[10] The trial court ordered, as part of Baldwin's sentence, that he "submit a DNA sample while in prison. If not, it is a condition of extended supervision, and he shall pay for the surcharge for that." Baldwin's trial attorney then stated, "Judge, I believe that the defendant has already given a DNA sample in the past." The court responded, "If he has, he does not have to provide another sample. The DNA surcharge, he would be responsible for that. That is a surcharge that is assessed and—and funds, actually, the DNA testing in part, and I think it's appropriate that he pay the surcharge for that. If he's been tested already, I will not require a second actual testing of him." Neither Baldwin nor his lawyer objected further.

¶ 29.   On June 12, 2009, Baldwin's postconviction counsel filed a notice of appeal "from the conviction entered on April 18, 2008, and the sentence entered on June 19, 2008." Thereafter, on July 20, 2009, Baldwin filed a *pro se* postconviction "Notice of Motion To Vacate DNA Surcharge." The trial court issued a written order denying his postconviction motion on the grounds that Baldwin was represented by counsel at the time of the

---

[10] The prison and extended supervision portion of Baldwin's sentences are not relevant to the issues on appeal, and as they are quite lengthy, we need not recite them here.

filing and the court would not entertain his *pro se* motion when he had counsel appointed. Baldwin appeals.

## STANDARD OF REVIEW

■

¶ 30. "Although a [trial] court's decision to admit evidence is ordinarily a matter for the court's discretion, whether the admission of evidence violates a defendant's right to confrontation is a question of law subject to independent appellate review." *State v. Jensen*, 2007 WI 26, ¶ 12, 299 Wis. 2d 267, 727 N.W.2d 518 (quoting *Williams*, 253 Wis. 2d 99, ¶ 7) (internal quotation marks and one citation omitted). On review, we accept the trial court's findings of fact unless they are clearly erroneous. *State v. Jackson*, 216 Wis. 2d 646, 655, 575 N.W.2d 475 (1998).

■

¶ 31. A trial court properly exercises its discretion when the record shows it " 'examined the relevant facts, applied a proper standard of law, and, using a demonstrated rational process, reached a conclusion that a reasonable judge could reach.' " *State v. Jenkins*, 2007 WI 96, ¶ 30, 303 Wis. 2d 157, 736 N.W.2d 24 (citation omitted).

## DISCUSSION

### I. Forfeiture by Misconduct

¶ 32. Baldwin argues that the trial court violated the Confrontation Clause of the United States Constitution when it admitted into evidence at trial R.Z.'s hearsay statements to police officers about what Bald-

win did to her. Specifically, Baldwin argues that the trial
court erred in admitting the hearsay under the forfei-
ture by wrongdoing doctrine because the record fails to
support the trial court's unavailability finding and the
trial court relied on the forfeiture by wrongdoing test
adopted by the Wisconsin Supreme Court in *Jensen*,
which has now been superseded by *Giles*.

¶ 33.   The State counters that the trial court prop-
erly found R.Z. unavailable and that the record shows
that the trial court's finding of forfeiture by wrongdoing
comports with the recently adopted test from the
United States Supreme Court in *Giles*. We agree with
the State and affirm.

### A. Baldwin's "Bad Law" Argument

¶ 34.   The forfeiture by wrongdoing doctrine is an
exception to the Sixth Amendment's Confrontation
Clause.[11] *Id.*, 128 S. Ct. at 2682–83. Although the
Confrontation Clause gives defendants the right to
cross-examine the witnesses who give testimony
against them, the United States Supreme Court has
found exceptions to this general rule. *Id.* One of those
exceptions recognized at common law was forfeiture by
wrongdoing, which "permitted the introduction of state-
ments of a [declarant] who was 'detained' or 'kept away'
by the 'means or procurement' of the defendant." *Id.* at
2683 (citations omitted).

■
¶ 35.   The forfeiture by wrongdoing doctrine is
based on equitable grounds, not alternative reliability

---

[11] "The Sixth Amendment provides that '[i]n all criminal
prosecutions, the accused shall enjoy the right . . . to be con-
fronted with the witnesses against him.' " *Giles v. California*,
554 U.S. 353, 128 S. Ct. 2678, 2687 (2008) (alterations in *Giles*).

grounds. *Jensen*, 299 Wis. 2d 267, ¶ 37 (citing *Reynolds v. United States*, 98 U.S. 145, 158–59 (1878)). The doctrine arises out of public policy against permitting a defendant to profit from his own wrongdoing. *United States v. Carlson*, 547 F.2d 1346, 1359 (8th Cir. 1976). ("To permit the defendant to profit from such conduct would be contrary to public policy, common sense and the underlying purpose of the [C]onfrontation [C]lause.").

¶ 36. In 1997, FED. R. EVID. 804(b)(6) was created, codifying the common law doctrine of forfeiture by wrongdoing. *Giles*, 128 S. Ct. at 2687. The rule created an exception to the general prohibition against hearsay if a court found a declarant to be unavailable because the party against whom the statement was offered "engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness." RULE 804(b)(6).

¶ 37. Wisconsin has no similar evidentiary rule, and it was not until *Jensen*, which was decided on February 23, 2007, that the Wisconsin Supreme Court first adopted the doctrine of forfeiture by wrongdoing. *See id.*, 299 Wis. 2d 267, ¶ 52 ("In other words, after '[n]oting the broad embrace of the doctrine' by courts nationwide and 'recognizing the compelling public policy interests behind its enactment,' we elect to adopt the forfeiture by wrongdoing doctrine in Wisconsin.") (brackets in *Jensen*; citation omitted). In doing so, the Wisconsin Supreme Court adopted the broader of two views of the doctrine: "if the State can prove by a preponderance of the evidence that the accused caused the absence of the witness, the forfeiture by wrongdoing doctrine will apply to the confrontation rights of the defendant." *Id.*, ¶ 57.

¶ 38.  *Giles* was not decided until June 25, 2008, sixteen months after *Jensen*. In *Giles*, the United States Supreme Court interpreted past precedent to permit only those hearsay exceptions to the Confrontation Clause that were established at the time of the founding of the country. *See id.*, 128 S. Ct. at 2682 ("[T]he Confrontation Clause is 'most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding.' ") (citing *Crawford v. Washington*, 541 U.S. 36, 54 (2004)). The Court acknowledged that the forfeiture by wrongdoing doctrine was in existence at the time of the founding, but concluded that at that time it "applied only when the defendant engaged in conduct *designed* to prevent the witness from testifying." *Id.* at 2683. Additionally, the Court in *Giles* noted that all interpreters of FED. R. EVID. 804(b)(6) had concluded that the exception only applied when the defendant *intended* to prevent the witness from testifying. *See Giles*, 128 S. Ct. at 2687 ("Every commentator we are aware of has concluded the requirement of intent [in RULE 804(b)(6)] 'means that the exception applies only if the defendant has in mind the particular purpose of making the witness unavailable.' ") (citations omitted).

¶ 39.  Therefore, the Court in *Giles* held that forfeiture by wrongdoing required not just that the defendant prevented the witness from testifying, but also that the defendant *intended* to prevent the witness from testifying. *See id.* at 2684–86. In doing so, the Court reaffirmed the doctrine's viability generally, but chose the narrower view of its scope. *See id.* This narrower view was the one advanced by Justice Louis Butler's dissent in *Jensen*. *See id.*, 299 Wis. 2d 267, ¶¶ 84–97 (Butler, J., concurring in part, dissenting in part).

¶ 40. The holding in *Giles* did not explicitly dictate the method by which the State must prove the defendant's intent to prevent the declarant from appearing and testifying. However, the majority addressed the issue when responding to the dissent's concern that the majority's narrow view of the doctrine could negatively impact domestic violence cases. Significantly, the majority noted that evidence of past abuse or threats was "highly relevant" to the proof of the defendant's intent to prevent the victim from testifying, especially if there were ongoing proceedings at which the victim would be expected to testify:

> Acts of domestic violence often are intended to dissuade a victim from resorting to outside help, and include conduct designed to prevent testimony to police officers or cooperation in criminal prosecutions. Where such an abusive relationship culminates in murder, the evidence may support a finding that the crime expressed the intent to isolate the victim and to stop her from reporting abuse to the authorities or cooperating with a criminal prosecution—rendering her prior statements admissible under the forfeiture doctrine. Earlier abuse, or threats of abuse, intended to dissuade the victim from resorting to outside help would be highly relevant to this inquiry, as would evidence of ongoing criminal proceedings at which the victim would have been expected to testify.

*Id.*, 128 S. Ct. at 2693.

¶ 41. Here, the trial court ruled that the State had met its burden of proving forfeiture by wrongdoing by a preponderance of the evidence because it demonstrated that "the defendant, Scottie Baldwin, has intimidated the State's witness, R[.]Z[.], from attending court *to testify against him at trial.*" (Emphasis added.) At the

time of the trial court's ruling, *Giles* had not been decided and *Jensen*, with its broader view of the forfeiture by wrongdoing doctrine, required only that the defendant prevent the witness from appearing. Despite *Jensen*'s broader interpretation of the doctrine, in a prescient decision, the trial court went beyond finding that Baldwin's actions satisfied that more lenient holding in *Jensen* and found that Baldwin's actions satisfied the yet-to-be-decided *Giles* holding. Whether the trial court was aware of the dissent in *Jensen*, or whether the trial court acted on its own judicial instincts, the trial court made the correct legal finding, namely, that Baldwin's intent was to prevent R.Z. from testifying at trial.

¶ 42.  In his reply brief, Baldwin concedes that the trial court made the correct legal finding when he failed to respond to the State's assertion that the trial court made the correct finding. *See Charolais Breeding Ranches, Ltd. v. FPC Sec. Corp.*, 90 Wis. 2d 97, 109, 279 N.W.2d 493 (Ct. App. 1979) (arguments not refuted are deemed conceded). Rather, Baldwin argues for the first time in his reply brief that the trial court erred because "all of the evidence presented to the trial court concerned prior acts of intimidation." In other words, Baldwin claims for the first time in his reply brief that his past behavior and successful attempts to prevent R.Z. from testifying at prior hearings are insufficient proof that Baldwin intimidated R.Z. and prevented her from testifying on April 14, 2008.

¶ 43.  Baldwin's argument fails for two reasons. First, the trial court properly found that Baldwin intended to prohibit R.Z. from testifying on April 14, 2008, stating:  "This court finds, by a preponderance of the evidence, that the defendant, Scottie Baldwin, has in-

timidated the State's witness, R[.]Z[.] from attending court to testify against him at trial."

¶ 44. Second, as noted in *Giles*, Baldwin's past physical violence and threats to R.Z. are "highly relevant" to a finding of wrongdoing by forfeiture, even if alone such evidence is not sufficient proof of his present intent. *Giles*, 128 S. Ct. at 2693. *Giles* stated that prior acts, particularly in the domestic violence context, are "highly relevant" to the question of whether the defendant's intent was to prevent the witness from appearing and testifying. *Id.* The record here shows many examples of highly relevant past physical violence and threats. Most notably, the trial court had already found, following the August 2 and 3, 2007 preliminary hearing in Case No. 2007CF3514, that Baldwin had previously intimidated R.Z. from appearing and testifying in an earlier case. The trial court's decision at that time was based on the testimony of Deputy Urban and Garcia, and the exhibits entered into evidence, including the card Baldwin sent R.Z. from jail directing her not to appear or testify. That instance of intimidation was not remote and, in fact, the charges in that case were still before the court.

¶ 45. Finally, with regard to the trial court's forfeiture by wrongdoing finding, we note that Baldwin does not challenge the sufficiency of the record to support the trial court's factual findings that he intimidated R.Z., preventing her from appearing to testify at trial. Indeed, Baldwin could not challenge the sufficiency of the evidence because the jury subsequently found Baldwin guilty, beyond a reasonable doubt, of three counts of intimidating R.Z. based on that same evidence. The jury's findings confirm the trial court's earlier finding of intimidation by a preponderance of

the evidence. *See State v. Rodriguez*, 2007 WI App 252, ¶ 19, 306 Wis. 2d 129, 743 N.W.2d 460.

*B. Unavailability*

¶ 46.   Baldwin also argues that the trial court's finding that R.Z. was unavailable on April 14, 2008, the first day of trial, was an erroneous exercise of discretion because the State did not do enough to return R.Z. on the body attachment that was issued early that morning. Baldwin argues that the trial court erred in not requiring the State to provide proof of its attempts to locate R.Z. on the body attachment.

■

¶ 47.   Baldwin fails to cite any authority in support of his argument that a finding of unavailability requires the State to prove the extent of its attempts to serve a body attachment. We need not consider unsupported arguments. *Kruczek v. DWD*, 2005 WI App 12, ¶ 32, 278 Wis. 2d 563, 692 N.W.2d 286.

¶ 48.   Nonetheless, we note that the record supports the trial court's unavailability finding. WISCONSIN STAT. § 908.04(1)(e) requires the proponent of a witness to secure the witness's appearance " 'by process or other reasonable means.' " *Williams*, 253 Wis. 2d 99, ¶ 62. The proponent must make a " 'good-faith effort' " and exercise " 'due diligence' " to secure the witness's presence. *Id.*

¶ 49.   Here, the trial court properly found that the State had met its burden of showing that R.Z. was unavailable under WIS. STAT. § 908.04 and that the State exercised due diligence and good faith in attempting to secure her presence. *See Williams*, 253 Wis. 2d 99, ¶ 62. The trial court stated: ·

523

**THE COURT**: The State has provided me with a subpoena that demonstrates that R[.]Z[.] was served with a copy of the subpoena on April 14th—excuse me—on March 31[], 2008, at 2:16 p.m. requiring her attendance in court today, April 14th, at 8:30 in the witness waiting room of the courthouse. This case was called earlier today, and R[.]Z[.] had not appeared, and I take it the State double-checked that she was not in the waiting area; is that correct?

[**STATE**]: Yes, Judge.

**THE COURT**: And I issued a body attachment. I don't recall, exactly, what time that was. It took some time to bring the defendant over from court staging. I'm just guessing maybe around 9:30 or so. It was signed by the court, but I'm just guessing sometime this morning it was signed by the Court. And—and the State has sent out officers looking for Ms. Z[.], and she is not in court.

I believe, based upon the State's attempts, they have made a good faith attempt to secure her appearance in court on today's date, and R[.]Z[.] is not here.

¶ 50.   In addition to successfully serving R.Z. with process for the trial, the record shows that the State successfully served R.Z. with process two previous times—on June 21, 2007 and January 7, 2008—and once in 2005. Each time, R.Z. failed to appear. Despite R.Z.'s past failures to appear, the State served her again, and on the morning of the jury trial, April 14, 2008, the State obtained a body attachment and again unsuccessfully attempted to return R.Z. to court. Based on the above record, the trial court found that the State had exercised due diligence and made a good faith effort to produce R.Z. for trial, but that despite that effort R.Z. was unavailable. *See La Barge v. State,* 74 Wis. 2d 327,

336–39, 246 N.W.2d 794 (1976) (issuance of subpoena and arrest warrant for witness is sufficient to show State's due diligence to secure witness's presence).

¶ 51. Accordingly, we conclude that the record shows that the trial court "examined the relevant facts, applied a proper standard of law, and, using a demonstrated rational process, reached a conclusion that a reasonable judge could reach.'" *See Jenkins*, 303 Wis. 2d 157, ¶ 30 (citations omitted). Therefore, we affirm the admission of R.Z.'s hearsay statements under the forfeiture by wrongdoing doctrine.

## II. Authentication of Telephone Recordings

¶ 52. Next, we address the admissibility of the telephone recordings. Baldwin argues that the telephone recordings were not properly authenticated under WIS. STAT. § 909.015 because the State failed to follow the enumerated methods of authentication listed in the statute, and as a result, the State failed to prove that Baldwin made the calls and that R.Z. received them.[12] The State points out that the examples of methods of authentication set forth in § 909.015 are merely illustrative and that the telephone recordings were properly authenticated by both direct and circumstantial evidence.

¶ 53. The trial court found that the telephone recordings were properly authenticated because the State had sufficiently identified Baldwin as the caller and R.Z. as the recipient of the calls, by presenting: (1) the testimony of a lay witness (Garcia) who

_____

[12] Baldwin does not dispute the accuracy of the telephone recording transcripts.

identified the voice of the recipient of the calls as belonging to R.Z.; (2) Milwaukee County Jail records identifying the specific pods in the jail from which the calls were made as the same pods that Baldwin was assigned to and identifying the times the calls were made as times when Baldwin was there; and (3) the details in the telephone calls themselves, which demonstrated knowledge familiar only to Baldwin and R.Z. We agree and affirm.

¶ 54. WISCONSIN STAT. ch. 909 sets forth the rules on authentication. WISCONSIN STAT. § 909.01 provides: "**General provision.** The requirements of authentication or identification as a condition precedent to admissibility are satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." In other words, as applied here, § 909.01 provides that the trial court, as gatekeeper, must exercise its discretion to determine whether the evidence is sufficient to prove that Baldwin made the calls to R.Z.

¶ 55. WISCONSIN STAT. § 909.015 lists examples of ways to authenticate, but expressly states that it is not an exhaustive or exclusive list. *Id.* ("By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of s. 909.01[.]"). Indeed, telephone calls can be authenticated by circumstantial evidence. *See Campbell v. Wilson,* 18 Wis. 2d 22, 30 n.1, 117 N.W.2d 620 (1962).

■

¶ 56.   We conclude that the record identifies Baldwin as the caller and R.Z. as the recipient of the telephone calls through both direct and circumstantial evidence. First, Garcia testified at the August 2 and 3, 2007 preliminary hearing that R.Z. gave Garcia her

telephone number, (414) 588–4372, and asked Garcia to call her. Garcia testified that she called R.Z. at that number and spoke to her on the telephone seven or eight times and heard Garcia's voice once in person. Based on that contact, Garcia identified R.Z's voice on the telephone recordings made from the Milwaukee County Jail. This is one of the authentication methods illustrated in WIS. STAT. § 909.015(5). ("VOICE IDENTIFICA-TION. Identification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker.").

¶ 57. Additionally, Deputy Urban testified at the preliminary hearing that Milwaukee County Jail records, admitted into the record, revealed several tele-phone calls made to (414) 588–4372, R.Z.'s phone num-ber, from the pod that Baldwin was housed in during the time he was in jail, providing circumstantial evidence that Baldwin was the caller. Further, in one of the recordings, a three-way call to Baldwin's attorney, Bald-win identified himself as the caller, leaving a message for his attorney saying that "Mr. Baldwin" called. This is a variant on a method of authentication listed in the statute. *See* WIS. STAT. § 909.015(6)(a) ("TELEPHONE CON-VERSATIONS . . . circumstances, including self-identification.).

¶ 58. Finally, the telephone transcripts reveal that the caller and receiver in the recordings spoke about details surrounding Baldwin's cases that would be familiar only to Baldwin and R.Z. We note that Baldwin conceded before the trial court that the tran-scripts accurately reflected the content of the telephone calls. Sometimes the caller mentions, in reference to Baldwin's cases: various court dates, the prosecutor's

name, the judge's name, the existence of the body attachment for R.Z., instructions to the recipient on what to tell the court about not testifying, instructions on how to send a notarized recant letter to the court, the particulars of which charges were dropped that day, defense counsel's name, Baldwin's bail amount, and the amendments to the charges. In one call, the caller tells the recipient that she should name their son, "Knowledge Pablo Baldwin." In short, the details of the telephone calls add additional and substantial circumstantial evidence that identifies Baldwin as the caller and R.Z. as the recipient of the calls. Thus, we conclude that the record supports the authentication of the telephone recordings. Accordingly, we affirm the trial court.

### III. DNA surcharge

¶ 59.  Finally, Baldwin appeals the trial court's imposition of the DNA surcharge on the grounds that the trial court erroneously exercised its discretion under *Cherry* because it did not adequately explain its reasons for imposing the surcharge. The State argues that this court lacks jurisdiction over the issue because Baldwin failed to file a notice of appeal from the trial court's order denying his postconviction motion. We agree.

¶ 60.  On June 12, 2009, Baldwin, through his postconviction counsel, filed a notice of appeal "from the conviction entered on April 18, 2008, and the sentence entered on June 19, 2008." On July 20, 2009, although still represented by counsel, Baldwin filed a *pro se* postconviction motion, asking the court to vacate the DNA surcharge on *Cherry* grounds. Relying on *Moore v. State*, 83 Wis. 2d 285, 265 N.W.2d 540 (1978), the trial court denied the motion in a written order entered on July 31, 2009, on the grounds that the motion was filed

*pro se* and Baldwin was represented by counsel. *See State v. Wanta*, 224 Wis. 2d 679, 699, 592 N.W.2d 645 (Ct. App. 1999) ("[T]he [trial] court did not erroneously exercise its discretion by deciding not to consider [the defendant]'s *pro se* objection because he was represented in the proceedings by counsel.") (citing *Moore*, 83 Wis. 2d at 301–02). Baldwin never subsequently filed a notice of appeal from the trial court's order denying his postconviction *Cherry* motion.

■ ■

¶ 61.  WISCONSIN STAT. § 809.10(1) provides that an appeal is initiated by the filing of a notice of appeal from the "judgment or order appealed from."[13] Pursuant to WIS. STAT. § 809.10(4), the notice of appeal "brings before the court all prior nonfinal judgments, orders and rulings adverse to the appellant." (Emphasis added.) The notice of appeal must sufficiently identify the order being appealed from. *See State v. Avery*, 80 Wis. 2d 305, 309, 259 N.W.2d 63 (1977). Baldwin never filed a notice of appeal that identified the order denying his *Cherry* motion as the subject of his appeal. Baldwin admits that the notice of appeal his attorney filed in June 2009 identified only the judgment of conviction and sentence as the judgment and order appealed from. The notice of appeal did not mention Baldwin's *Cherry* motion, nor could it because Baldwin had not filed it yet. Consequently, we lack jurisdiction to consider the order under §§ 809.10(1), (4).[14]

---

[13] Although WIS. STAT. § 809.10(4) provides that "[a]n appeal from a final judgment or final order brings before the court all *prior* nonfinal judgments, orders and rulings adverse to the appellant," (emphasis added), by exclusion, it does not bring before the appellate court orders filed *after* the judgment or order appealed from is entered.

[14] We note that although Baldwin does not argue that his

¶ 62. Baldwin inaccurately states in his reply brief that he was *unable* to file a notice of appeal from the trial court's order denying his *pro se* postconviction motion because "there was no order of the court made which could be appealed." Baldwin is incorrect. Our review of the record reveals that the trial court issued a written order, on July 31, 2009, denying Baldwin's *pro se* postconviction motion to vacate the DNA surcharge. Because neither Baldwin, proceeding *pro se,* nor his postconviction counsel filed a notice of appeal from the trial court's July 31, 2009 order, this court lacks jurisdiction over his appeal of the surcharge.[15]

*By the Court.*—Judgments affirmed.

---

notice of appeal is sufficient under WIS. STAT. § 808.04(8), we address that statute also for completeness of our analysis. Section 808.04(8) provides an exception to WIS. STAT. § 809.10(4) and permits a notice of appeal to bring before the appellate court a judgment or order filed *after* the notice of appeal, but only when: (1) the party "sufficiently identified" the order being appealed from; and (2) the order had been made but not entered yet. *See Mayek v. Cloverleaf Lakes Sanitary Dist. #1*, 2000 WI App 182, ¶ 18, 238 Wis. 2d 261, 617 N.W.2d 235. Neither of those conditions occurred here. Accordingly, § 808.04(8) fails to convey jurisdiction of Baldwin's *Cherry* motion.

[15] While we resolve this issue by concluding that we lack jurisdiction to review the DNA surcharge, we also note that Baldwin never raised this issue in the trial court at sentencing. Although Baldwin correctly notes that his trial counsel told the court at sentencing: "Judge, I believe that the defendant has already given a DNA sample in the past," counsel objected to giving a second sample. He did not object to the imposition of the surcharge on *Cherry* grounds.