COURT OF APPEALS
DECISION
DATED AND FILED

April 4, 2023

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2021AP1709-CR**

Cir. Ct. No. 2019CF1815

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT I

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

ANTHONY EDWARD PEARSON,

DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Milwaukee County: JEAN M. KIES, Judge. *Affirmed*.

Before Brash, C.J., Dugan and White, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1      PER CURIAM.   Anthony Edward Pearson appeals his judgment of conviction, entered upon a jury's verdict, for first-degree recklessly endangering safety by use of a dangerous weapon, two counts of possession of a firearm by a felon, and two counts of disorderly conduct, with various repeater and domestic violence penalty enhancers attached.   Pearson argues that the trial court erred when it admitted an out-of-court statement by a witness not at trial through the doctrine of forfeiture by wrongdoing.   We conclude that the trial court's decision to admit this statement was within its discretion and did not violate his rights under the Confrontation Clause.   Accordingly, we reject Pearson's argument and we affirm.

## BACKGROUND

¶2      This case arises out of Milwaukee police officers responding to a ShotSpotter[1] report of numerous shots being fired on North 33rd Street in Milwaukee in April 2019.   According to the criminal complaint, police found spent cartridge casings in the street and near the house as well as bullet strikes that went through the walls of the house.   The police investigation showed that the bullets and casings were from two firearms:  a .40 caliber and a .45 caliber.   There were four adults and three children inside the house at the time of the shooting.   The suspected shooter was reported to have fled in a black Honda Civic.

---

[1] Testimony by Milwaukee police explained that ShotSpotter is technology that "detects gunfire."  It has been used in Milwaukee for approximately twenty years.  ShotSpotter sensors detect and identify gunfire, and its algorithm distinguishes gunfire from "fireworks" or a "car back firing."  Milwaukee police are then dispatched to investigate.  *See also* ***State v. Nimmer***, 2022 WI 47, ¶4, 402 Wis. 2d 416, 975 N.W.2d 598.

¶3 The complaint continued with the police officers and detectives' contact with people at the scene. First, Serena identified Pearson as her husband and the father of her child as well as the person who shot at the house.[2] Serena reported that she had gone to a tavern that evening with Pearson, Christine, who is Pearson's sister, and Aaron, who is Christine's husband. Pearson became upset with Serena for talking to someone else at the tavern. On the drive home, Pearson and Serena drove together and Pearson twice used his left hand to squeeze Serena's neck and impede her breathing. When they all arrived at Christine's residence on North 33rd Street, Christine confronted Pearson about his abuse of Serena in the car; in response, Pearson struck Christine. The fight moved outside and was broken up by Serena and Desmond, who is Pearson and Christine's nephew. Serena told police she went inside the house and thirty seconds later, the house was shot up.

¶4 Serena also informed police that Pearson was a felon, but he had access to two firearms that belonged to her—a 9mm handgun and a .40 caliber handgun—that were kept in a gun safe in Pearson's car.

¶5 Christine told police that she was with Serena in the kitchen of her residence on North 33rd Street after they got back from the tavern. Pearson and Serena got into a fight, Pearson pushed Serena out of her chair, then said he was heading outside, and then punched Christine in the nose. Pearson exited the house twice, while stating, "y'all gonna see." Christine closed the door and immediately heard shots fired directly at the house.

---

[2] To protect confidentiality and for ease of reading, we refer to the witnesses and victims in this matter by pseudonyms. *See* WIS. STAT. RULE 809.86 (2021-22). All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

¶6 Aaron's conversation with police confirmed that the four of them visited a tavern; Serena and Pearson argued over her talking to another person; and there was an argument when they returned to North 33rd Street. Aaron told Pearson to leave, and Pearson stated, "y'all gonna see." Moments after Pearson left the house, Aaron recalled hearing approximately seventeen shots in two bursts.

¶7 The police also spoke with Desmond, who recounted that Pearson was in an argument in Christine's residence on North 33rd Street and then went outside, where Desmond saw Pearson go to his car, pull a gun case out of the vehicle, and several seconds later, "the house was shot up." Desmond told police that Pearson had shown him two separate guns in the same gun safe approximately a week before the shooting.

¶8 Additionally, the police spoke with Pearson and Christine's mother, who reported to police that Christine called during the incident and said that Pearson had shot up her house. She then stated that Pearson called her and claimed that Christine had shot at him; to which Pearson's mother responded that she did not believe him and Pearson apologized.

¶9 Pearson turned himself in to police, and upon questioning, he first denied being with his wife on the night of the shooting, stating he was under a no-contact order with her. When told there was video of Serena at the bar with him, Pearson admitted they were together. He stated that he did not get physical with Serena in the car, but admitted to accidentally punching her when they were back at the residence on North 33rd Street. He stated he left in his car to clear his head and he left when he heard gunshots because he assumed they were aimed at him.

He did not immediately report the shooting to police because he was on parole and he did not want to go to jail.

¶10    In May 2019, the State issued the information against Pearson, which set forth five counts:  first-degree recklessly endangering safety, with use of a dangerous weapon, the habitual criminality repeater, and the domestic abuse assessment penalty enhancers contrary to WIS. STAT. §§ 941.30(1), 939.63(1)(b), 939.62(1)(b), 973.055(1); two counts of possession of a firearm by a person convicted of a felony with the repeat firearms crimes mandatory minimum sentence penalty enhancer contrary to WIS. STAT. §§ 941.29(1m)(a), 939.6195(2); and two counts of disorderly conduct with the habitual criminality repeater and the domestic abuse assessment penalty enhancers contrary to WIS. STAT. §§ 947.01(1), 939.62(1)(a), 973.055(1).

¶11    The case against Pearson proceeded toward a jury trial.  On the morning of the first day of trial in September 2019, the State informed the court that it filed a motion to introduce Serena and Desmond's out-of-court statements during the trial under the doctrine of forfeiture by wrongdoing.  In the motion, the State alleged that Pearson made several phone calls while in custody at the Milwaukee County Criminal Justice Facility (CJF).  Pearson made at least four calls to Serena.  When the police reviewed the call recordings, in a call on April 25, 2019, Serena told Pearson that his daughter, Sondra, would need to contact his probation officer for him.  In a call on April 27, 2019, Pearson called Sondra and asked her to reach out to her uncle David and ask his son (Desmond) to spare Pearson's life.  Pearson told Sondra that "D" saw him do it and he was a witness against Pearson.  Sondra agreed to try to reach out in person to her uncle.

¶12    The State's motion also recounted that after reviewing Pearson's phone calls, his voice, and his location, the police concluded that Pearson next called Serena from another inmate's account, telling her she should get a new number because they were not supposed to have contact. After discussing the account in the police report, Pearson told Serena that her account and Desmond's account of the night of the shooting were "killing" him. Serena called Pearson from a different number and they discussed that Desmond was also in jail.

¶13    The State's motion further set forth that from April 24, 2019, through May 3, 2019, Pearson called Serena more than seventy times. In multiple calls, Serena told Pearson she loved him and she will come or not come to proceedings depending on what he thinks is best. When served with a subpoena to testify during the final pretrial conference, Serena was upset and she called the DA's office three days before trial stating she refused to testify. A process server attempted to serve Desmond with a subpoena to testify; however, an individual matching his description was uncooperative and refused to sign.

¶14    The trial court conducted a hearing that same day on the motion for forfeiture by wrongdoing. Serena was identified in the gallery of the courtroom; therefore, the State withdrew its request with regard to Serena. The State presented testimony first from a detective who reviewed Pearson's recorded jail phone calls and who conducted the second interview with Pearson after he turned himself in. The detective's testimony consisted of the facts alleged by the State in its motion. The State called the victim/witness advocate who testified about the State's three failed attempts to serve Desmond. In the first attempt at the address on file for Desmond, a woman answered the door and said he wasn't home. In the second attempt, a woman, who identified herself as Desmond's grandmother, answered the door stating she did not know where he stayed and that she saw him

there from time to time. In the third attempt, a man generally matching Desmond's description answered the door and refused to sign the subpoena. Finally the State called Desmond's former attorney, who testified that the address used by the State's process server was the address he used to reach Desmond, and his mail had not been returned.

¶15 The trial court found that the State made "made a good faith effort and exercised due diligence to secure the witness' presence by virtue of their efforts on those three occasions to get him the subpoena." Then, the trial court analyzed that Pearson's phone calls showed that he had the requisite intent to prevent Desmond from testifying. The court concluded that the State met its burden under the doctrine of forfeiture by wrongdoing to introduce Desmond's statements through the police detective witness testimony.

¶16 The trial then continued. The State called Serena, whose testimony was somewhat similar to that recorded in the criminal complaint; although she denied domestic violence by Pearson. The State called multiple police officers and detectives who responded to the shots fired complaint and who investigated the shooting in various ways.

¶17 Turning to the issues related to Desmond, the State called a detective who recounted Desmond's statements on the night of the shooting. The detective testified that Desmond told him he watched three children—Pearson and Serena's young daughter and Christine and Aaron's two children—while the four adults went to the tavern. When the adults arrived home, Desmond took the kids into the kitchen, away from the adults. He returned to the front when he heard Serena scream and he saw Christine and Pearson physically fighting. Desmond and Serena broke up the fight when it spilled outside in front of the house. He

7

observed Pearson open the trunk of the black Honda and retrieve the gun safe. Desmond then closed the door, leaving Pearson outside.

¶18 The detective's testimony continued, stating that Desmond recounted that the moment after shutting the door, Desmond heard shots being fired and he thought that Pearson was the shooter because Pearson was alone outside at the time of the shooting. Desmond told the detective that Pearson had shown him the gun safe and the guns about a week earlier. During cross-examination, the detective clarified that Desmond did not claim he could see Pearson open the safe, he did not know what was in the safe the night of the shooting, he could not see into the trunk, and that he did not claim to see Pearson shoot.

¶19 The State then called the detective who both was part of the investigation of the shooting and who reviewed Pearson's jail calls. He testified that Pearson and Serena had many phone calls: in some she used a pseudonym, but the detective could recognize her voice; in some they discussed financial matters; and in some they discussed the case. The detective also reviewed calls between Sondra and Pearson, and specifically discussed the call in which Pearson asked Sondra to reach out to Uncle David, who is Desmond's father, to try to talk Desmond into saving Pearson's life. The State played the recorded call while the detective was on the witness stand. The State also played a call in which Pearson stated that it was Serena and Desmond's statements that would hurt him, not Christine and Aaron's statements, as he originally thought.

¶20 The jury returned guilty verdicts on all five counts against Pearson on September 20, 2019. In November 2019, the trial court imposed an overall term of sentence of twenty two years, six months, divided as twelve years six

months of initial confinement and ten years of extended supervision, with consecutive and concurrent sentences imposed on the various counts.

¶21    Pearson now appeals.

## DISCUSSION

¶22    Pearson argues that the trial court erred when it granted the State's motion to admit Desmond's out-of-court statements under the doctrine of forfeiture by wrongdoing.  Pearson argues that the State failed to satisfy the prerequisites of the doctrine, arguing that the State failed to prove that Desmond was unavailable to testify, or to prove that Pearson was the cause of Desmond's failure to appear because there was no evidence to suggest that Desmond was aware that Pearson was concerned about his testimony.

¶23    Although the trial court's decision to admit evidence is ordinarily within its discretion, we independently review whether the admission of an out-of-court statement violates a defendant's Confrontation Clause right.  *State v. Reinwand*, 2019 WI 25, ¶17, 385 Wis. 2d 700, 924 N.W.2d 184.[3]  We accept the trial court's findings of fact unless they are clearly erroneous.  *State v. Baldwin*, 2010 WI App 162, ¶30, 330 Wis. 2d 500, 794 N.W.2d 769.  "A trial court properly exercises its discretion when the record shows it 'examined the relevant facts, applied a proper standard of law, and, using a demonstrated rational process,

---

[3] It appears undisputed that Desmond's statement to police was testimonial.  "Statements taken by police officers in the course of interrogations are also testimonial under even a narrow standard." *Crawford v. Washington*, 541 U.S. 36, 52 (2004).  Desmond's statement was taken at a crime scene, not in a custodial interrogation interview.  Nonetheless, we will consider the statement to be testimonial for the purpose of our analysis.

reached a conclusion that a reasonable judge could reach.'" ***Id.***, ¶31 (citation and one set of quotation marks omitted).

¶24 The Confrontation Clause of the Sixth Amendment to the United States Constitution states that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him[.]" U.S. CONST. amend. VI; *see also* WIS. CONST. art. I, § 7; ***Reinwand***, 385 Wis. 2d 700, ¶19. An exception from the protections of the Confrontation Clause is "forfeiture by wrongdoing, which permit[s] the introduction of statements of a [declarant] who was detained or kept away by the means or procurement of the defendant." ***Baldwin***, 330 Wis. 2d 500, ¶34 (citations omitted and internal quotation marks omitted; second set of brackets in ***Baldwin***).

¶25 The forfeiture by wrongdoing exception is "applied only when the defendant engaged in conduct *designed* to prevent the witness from testifying." ***Giles v. California***, 554 U.S. 353, 359 (2008). In our analysis to determine the application of the doctrine, we consider two prongs. The first prong is whether the witness is "unavailable" pursuant to WIS. STAT. § 908.04, and whether the proponent of the testimony made a good faith effort and exercised due diligence to secure the witness's presence, *see* ***Baldwin***, 330 Wis. 2d 500, ¶48. The second prong is whether the defendant was the substantial cause of the witness's unavailability, *see* ***State v. Rodriguez***, 2007 WI App 252, ¶15, 306 Wis. 2d 129, 743 N.W.2d 460, and whether the defendant intended to prevent the witness from testifying, *see* ***Giles***, 554 U.S. at 359. The State bears the burden to prove by a preponderance of the evidence that forfeiture by wrongdoing doctrine applies. ***Baldwin***, 330 Wis. 2d 500, ¶37.

¶26     We begin with unavailability. It is undisputed that Desmond did not show for trial. The State asserts that it attempted with due diligence and good faith efforts to have Desmond appear through use of the process server and subpoena. This complies with WIS. STAT. § 908.04(1)(e). However, Pearson argues that the State's efforts were insufficient and lacked due diligence. He contends that the State failed to provide testimony from the process server who had personal knowledge of the service attempts and that it was insufficient to rely upon the victim/witness advocate's testimony. However, as the State points out, there is no requirement that the process server testify in court. Pearson provides no legal authority to compel the process service to testify and we decline to develop such an argument for him. *See State v. Pettit*, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992).

¶27     Further, Pearson argues that Desmond was not unavailable because the State failed to prove that the residence used by the process server was Desmond's actual address. Pearson contends that Desmond's former attorney's testimony only supported that Desmond used that address for a mailing address, not that he resided there and could be found there. Pearson argues that Desmond's purported grandmother did not claim he lived at that address, merely that he was there from time to time. We reject this argument because Pearson offers no evidence that Desmond does not live at his legal mailing address and instead only speculates about other addresses.

¶28     Pearson argues that the State did not present any evidence of any search for Desmond, other than the three attempts at service at the same place. Pearson objects that the State did not employ an arrest warrant or body attachment to find Desmond. However, we have rejected this argument previously and Pearson offers no legal authority for his contention that a body attachment is

needed to show due diligence. *See **Baldwin***, 330 Wis. 2d 500, ¶47. Pearson also argues that the State's efforts were insufficient because it only attempted to serve Desmond ten days prior to trial—a trial date that was known for two and a half months before trial. We reject this argument as well. There is no evidence in the record that suggests that additional notice would have impacted Desmond's availability.

¶29 We conclude that the State made a good faith effort and acted with due diligence to secure Desmond's presence in court. The record reflects that the State's process server made three attempts at an address Desmond used for legal purposes. The people answering the door did not give an alternative address for Desmond. The third attempt may have been to Desmond himself, but the person matching his description refused to identify himself or sign for the subpoena. Accordingly, we conclude that the trial court's conclusions that the State proved the first prong by a preponderance of evidence are not an erroneous exercise of discretion and its findings are not clearly erroneous.

¶30 Turning to the second prong of the forfeiture analysis, we must consider whether Pearson was the cause of Desmond's unavailability and that his actions were intended to prevent Desmond's testimony.[4] Pearson argues that the

---

[4] As a threshold issue, the State argues that Pearson conceded this part of the analysis in the motion hearing. The record reflects that Pearson's trial counsel stated, "I believe element two has been met. If they don't show up, then this is allowed in. If they do show up, then it's moot[.]" Pearson disputes any concession, stating that in the same hearing, trial counsel argued that the only record of Desmond's reaction to Pearson's calls to Serena and Sondra was that Uncle David relayed that he could not make Desmond do anything. Trial counsel further argued that Desmond was an "independent thinker" and that the State failed to show that Pearson's actions had any effect on Desmond's availability. We conclude that even if Pearson did not concede the causation part of the analysis, there is sufficient evidence in the record regarding whether Pearson caused Desmond not to appear. Therefore, we will decide this claim on the merits and not on the issue of whether or not he conceded or forfeited the claim.

State failed to show that he caused Desmond not to appear because there is no evidence in the record that Desmond was aware that Pearson was worried about Desmond's testimony and further, no evidence that Desmond was affected by Pearson's concern. Pearson argues that instead, the evidence supports a reasonable inference that Desmond was an independent thinker who was free from Pearson's influence.

¶31 The State argues that the voluminous phone calls from Pearson to Serena and Sondra showed Pearson's intent to prevent Desmond from testifying. The detective who reviewed Pearson's jail calls stated that Pearson described Desmond's testimony as "killing him." The detective's testimony showed Pearson's repeated attempts to have his wife or his daughter reach Desmond directly or to reach Pearson's brother who could then reach Desmond. The record reflects that Pearson asked Sondra to contact her uncle and "tell him to convince his son to spare [Pearson's] life." Pearson told Sondra that "D" had seen Pearson "do it" referring to the shooting. Pearson told Serena that he was afraid Desmond would testify against him. Our inquiry here focuses on the intent behind Pearson's actions. We conclude that Pearson's phone calls showed the requisite intent to prevent Desmond from testifying.

¶32 Finally, the State argues that when we analyze causation under the forfeiture analysis, there need not be threats or violence to satisfy the inquiry. The trial court is allowed to draw reasonable inferences from the facts in the record. The record reflects a large number of calls and pressure from Pearson to Serena and Sondra with a recurring focus on preventing Desmond from testifying. The trial court's conclusion that Pearson's conduct was the cause of Desmond's unavailability at trial was a reasonable inference from the facts in the record. Accordingly, we conclude that the trial court's conclusions that the State proved

13

the second prong by a preponderance of evidence are not an erroneous exercise of discretion and its findings are not clearly erroneous.

¶33 We conclude that the trial court's decision to admit Desmond's statements under the doctrine of forfeiture by wrongdoing was a reasonable exercise of discretion. The court considered the relevant facts of Desmond's non-appearance at trial, the State's efforts to serve him with a subpoena to appear, and Pearson's concerted telephonic efforts to prevent Desmond from testifying. The trial court considered the proper standard of law for forfeiture by wrongdoing and demonstrated rational decision-making when it reached its conclusion. *See id.*, ¶31. Therefore, we reject Pearson's claim that the trial court erred when it admitted Desmond's statements.

¶34 Further, we conclude there has been no violation of Pearson's rights under the Confrontation Clause. Pearson forfeited, by his own misconduct, his right to confront Desmond. *See Rodriguez*, 306 Wis. 2d 129, ¶¶17-18.

## CONCLUSION

¶35 For the reasons stated above, we conclude that the trial court's decision to admit Desmond's out-of-court statement against Pearson was not an erroneous exercise of discretion and did not violate his rights under the Confrontation Clause.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.