COURT OF APPEALS
DECISION
DATED AND FILED

June 3, 2026

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal Nos. 2023AP1971-CR**
**2023AP1972-CR**
**2023AP1973-CR**

Cir. Ct. Nos. 2018CF1412
2018CF1547
2018CF1688

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT II

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

 V.

SUNKEUN KIM,

    DEFENDANT-APPELLANT.

            APPEAL from judgments of the circuit court for Waukesha County:
J. ARTHUR MELVIN, III, Judge. *Affirmed.*

            Before Neubauer P.J., Gundrum, and Grogan, JJ.

            **Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Sunkeun Kim was convicted in these consolidated cases of an escalating series of domestic violence offenses against his wife, culminating in her murder. On appeal, he argues that the circuit court violated his Sixth Amendment right of confrontation by admitting, under the forfeiture-by-wrongdoing doctrine, testimony from eleven witnesses regarding incriminating statements his wife had made about Kim prior to her death. Kim argues that the State failed to prove by a preponderance of the evidence that he killed his wife to prevent her from testifying. He also argues that certain forfeiture-by-wrongdoing testimony was needlessly cumulative and unfairly prejudicial to Kim. We reject these arguments and affirm.

## BACKGROUND

¶2 In Waukesha County Circuit Court Case No. 2018CF1412, Kim was charged with four domestic violence offenses and misdemeanor battery based on allegations that he had battered his wife Madeline in late August 2018, and that, about one month later, he had strangled, battered, and falsely imprisoned her. Kim signed a $15,000 signature bond; one condition was that he was that he have no contact with Madeline. Kim was also placed on GPS monitoring.

¶3 Kim was charged with felony bail jumping in Waukesha County Circuit Court Case No. 2018CF1547. Madeline contacted police in early October after Kim approached her in the University of Wisconsin—Milwaukee Student Union. The contact was captured on video surveillance. The police officer with whom Madeline spoke testified at trial that, according to Madeline, Kim was "trying to sweet talk to her, trying to convince her to change the story regarding an incident that happened here in Waukesha, and [saying] that he wanted to work on their marriage." Madeline filed for divorce on October 29, 2018.

¶4     On November 18, 2018, Madeline's roommate found her deceased in her bedroom after the roommate returned from a weekend away. The primary cause of death was identified as strangulation by neck compression. Madeline's neighbor, who lived in the condominium unit adjacent to hers and shared a bedroom wall with Madeline, told police that he heard two or three thumps just after midnight on November 17, 2018. The neighbor looked out the window and saw a black Toyota SUV parked outside of Madeline's other next-door neighbor's garage. He found this unusual because he never saw that vehicle before and he knew the residents of that unit were out of town. Kim drove a black Toyota RAV4.

¶5     There was other significant circumstantial evidence implicating Kim. On November 19, 2018, a GPS technician noted that there had been unusual activity on Kim's monitor over the weekend, including a tamper alert. When Kim reported for servicing the GPS bracelet, the technician observed that the monitor was tight-fitting and one of the two tabs on the backplate was broken. A subsequent search of Kim's phone revealed a deleted Google search on November 10, 2018 for "shoehorn ankle bracelet trick," among other incriminating searches.

¶6     Police made contact with Kim on November 20, 2018, and observed injuries on his left hand and arm. DNA consistent with Kim's was found on Madeline's t-shirt and under her fingernail. DNA consistent with Kim's was also found on bras present at the murder scene. Kim's phone had virtually no activity on the weekend of the homicide, as though it had been turned off—an unusual circumstance.

¶7 After Kim was charged with the homicide, the State moved to introduce numerous statements of Madeline's at his trial under the forfeiture-by-wrongdoing doctrine, an exception to a defendant's Confrontation Clause rights under *Giles v. California*, 554 U.S. 353 (2008). The State generally categorized the statements in two ways: statements by Madeline to law enforcement; and statements by Madeline to friends, family, and co-workers.[1] The State also sought to introduce translations of incriminating text messages between Kim and his cousin in the lead-up to the homicide, including Kim's concerns about the impact of a felony conviction on his employment and immigration status. Kim had also told his cousin shortly before Madeline was killed that he was able to remove his GPS monitor.

¶8 The circuit court held four evidentiary hearings on the State's motion and other pretrial motions before concluding that the forfeiture-by-wrongdoing evidence was admissible. The court found, as required by *Giles*, that the State had sufficiently demonstrated that Kim killed Madeline in an effort to prevent her from testifying regarding the August and September assaults. The court noted that Kim's conduct and statements had evidenced a desperation to avoid a felony conviction on his record; he was preoccupied with leaving the country and returning to South Korea, and to do that he needed Madeline to change her story about the domestic abuse and get the charges dropped. He had tried to prevent Madeline from resorting to outside help during the assaults and

---

[1] The latter category of statements is not at issue here except insofar as Kim's cumulative prejudice arguments are concerned. He otherwise concedes the latter category of statements was nontestimonial and therefore the statements' admission did not violate Kim's Sixth Amendment rights.

4

had overtly attempted to persuade her to retract her accusations at least once. The court found that there was insufficient evidence to support a different motive, such as theft or Kim's feelings about the pending divorce.

¶9    As the matter approached trial, the State sought to further refine its evidentiary presentation with a motion to admit the statements by Madeline to friends, family, and co-workers as proper other acts and not cumulative. When ruling on the forfeiture-by-wrongdoing motion, the circuit court had warned that it had "some concerns that the multiplicity of statements is somewhat overwhelming and may be otherwise unduly prejudicial." The court had, at that time, identified four individuals whose testimony about Madeline's statements was likely to be admitted.

¶10    The new motion included the specific statements the State intended to introduce at trial, and it identified 19 individuals who the State expected would offer that testimony. Statement by statement, the circuit court indicated which would be admitted, conditionally admitted, or excluded. The court also noted that, because of judicial rotation, it would not be presiding over the trial and it would be for the trial judge to "make the determination as to how the calendar proceeds during that trial and what happens. And if each and every one of these individuals is called, it may be that trial judge's determination that it is cumulative and that it is no longer appropriate."

¶11    Ultimately, at trial the State offered eleven witnesses who testified about statements Madeline had made to them. Generally, the statements concerned Madeline's description of the abuse that had occurred in relation to the August and September incidents, the anxiety she felt when Kim visited her on campus to get her to recant those accusations, and her fear of continuing threats

and abuse. The circuit court admitted some of those statements over the defense objection that additional testimony regarding details of the August and September incidents was cumulative.

¶12    At the conclusion of the ten-day trial, the jury found Kim guilty of all charged offenses. He was sentenced to life in prison. Kim now appeals.

## DISCUSSION

¶13    Kim challenges the admissibility of Madeline's statements under the forfeiture-by-wrongdoing doctrine. "Whether to admit evidence is generally a discretionary decision by the circuit court." *State v. Raczka*, 2018 WI App 3, ¶7, 379 Wis. 2d 720, 906 N.W.2d 722. Even if evidence was erroneously admitted, we will "conduct a harmless error analysis to determine whether the error affected the [defendant's] substantial rights … ." *State v. Nieves*, 2017 WI 69, ¶17, 376 Wis. 2d 300, 897 N.W.2d 363 (citation omitted).

¶14    Here, Kim contends the admission of Madeline's statements—at least, the statements she made to law enforcement with a "testimonial" character—violated his rights under the Confrontation Clause. We consider whether the admission of evidence violated a defendant's Confrontation Clause rights under a mixed standard of review. *State v. Baldwin*, 2010 WI App 162, ¶30, 330 Wis. 2d 500, 794 N.W.2d 769. "[W]e accept the trial court's findings of fact unless they are clearly erroneous." *Id.* However, we independently determine whether the admission of evidence violates a defendant's right to confrontation. *Id.*

¶15    "Under the forfeiture by wrongdoing doctrine, a defendant forfeits his Sixth Amendment right to confront a witness when the defendant wrongly procures that witness's unavailability by conduct designed to prevent the witness

6

from testifying." ***State v. Reinwand***, 2019 WI 25, ¶14, 385 Wis. 2d 700, 924 N.W.2d 184. The doctrine is rooted in the "public policy against permitting a defendant to profit from his own wrongdoing." ***Baldwin***, 330 Wis. 2d 500, ¶35.

¶16 The forfeiture-by-wrongdoing doctrine, as articulated in ***Giles***, requires proof by a preponderance of the evidence "not just that the defendant prevented the witness from testifying, but also that the defendant *intended* to prevent the witness from testifying." ***Baldwin***, 330 Wis. 2d 500, ¶¶37, 39 (emphasis in original). Here, Kim wages a two-pronged attack on his convictions, asserting the State failed to prove by a preponderance of the evidence both that he caused Madeline's death and that he did so with the specific intent to prevent her from testifying. We disagree with both assertions.

¶17 As the State sets forth, there was ample evidence to conclude that Kim caused Madeline's unavailability. The context of the relationship—including their recent separation and pending divorce—provided compelling circumstantial evidence that it was Kim who killed her. The DNA evidence and identification of a vehicle similar to Kim's at Madeline's residence near in time to her death also support that conclusion, as does the mischief surrounding Kim's GPS bracelet. The evidence was that Kim's scrutiny of Madeline's finances bordered on obsessive, but his log-ins to her bank account ceased shortly before her body was found. And, as set forth in more detail below, Kim's concerns about the effects of a felony conviction and his effort to persuade Madeline to recant her accusations of domestic abuse provide a powerful motive for murder.

¶18 Kim generally attacks the strength of this evidence, emphasizing that there were no witnesses to the homicide and that there may be innocent explanations for the circumstantial evidence—for example, mere coincidence that

a vehicle similar to his was spotted near the homicide scene. None of these individual arguments diminish the persuasiveness of the collective evidence, which draws a clear circumstantial path to Kim's guilt. And it is "well established" that guilt may be premised on "circumstantial evidence [that] is oftentimes stronger and more satisfactory than direct evidence." *State v. Poellinger*, 153 Wis. 2d 493, 501, 451 N.W.2d 752 (1990).

¶19     We similarly conclude that the State proved by a preponderance of the evidence that Kim acted with the specific intent to prevent Madeline from testifying. "Earlier abuse, or threats of abuse, intended to dissuade the victim from resorting to outside help would be highly relevant to this inquiry, as would evidence of ongoing criminal proceedings at which the victim would have been expected to testify." *Giles*, 554 U.S. at 377. All of those circumstances are present here.

¶20     As the circuit court recognized, the acts of domestic abuse, in addition to themselves being indicative of Kim's guilt, were punctuated with efforts to keep Madeline from reporting the crime. Kim does not dispute on appeal that during the September domestic assault, he took Madeline's keys and phone and strangled her repeatedly when she tried to get away and get help. There was also evidence that Kim was deeply concerned about the impact of felony convictions on his life. Text messages Kim sent to family suggest he devised a plan to persuade Madeline to recant her accusations. And there is ample evidence that he acted consistently with that plan when he contacted Madeline at the University of Wisconsin—Milwaukee Student Union.

¶21     That failed effort only exacerbated Kim's predicament. After Madeline filed for divorce, the text messages took a darker turn, often linking—

arguably explicitly, but at a minimum, inferentially—the court proceedings with his desire to kill Madeline. As the State notes, these proceedings included not only the felony prosecutions, but also the pending divorce. Proof of an intent to prevent Madeline from testifying during either proceeding would have been sufficient to satisfy the State's burden. *See United States v. Lentz*, 524 F.3d 501, 507, 528-29 (4th Cir. 2008) (upholding admissibility of statements when the homicide victim was scheduled to appear at a divorce proceeding involving significant child support and financial obligations). The State sufficiently demonstrated that Kim acted with the requisite specific intent to prevent Madeline's testimony.

¶22 Finally, Kim argues that he is entitled to a new trial because the circuit court erroneously admitted the forfeiture-by-wrongdoing testimony of several witnesses over his objection that their testimony was cumulative and unduly prejudicial. Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." WIS. STAT. § 904.03 (2023-24).[2] We agree with the State that the court appropriately exercised its discretion when, in response to Kim's objections, it limited the testimony to new matters or permitted a few questions and answers about previously addressed topics.

¶23 The first three of the witnesses Kim references described Madeline's statements about what had happened during the August and September incidents,

---

[2] All references to the Wisconsin Statutes are to the 2023-24 version.

which included statements about the specific acts of abuse that Kim had inflicted, that Madeline feared Kim, and that she desired to leave the marriage.[3]  The fourth witness, officer Nicole Funk, testified about what Madeline had told her about the September 22, 2018 domestic abuse incident, including a description of how Kim hit, strangled, and bit her.  The fifth witness, officer Lamar Griffin, testified about what Madeline had told him when she reported that Kim had violated the no-contact order to visit her on campus.  None of that testimony was objected to as unfairly prejudicial or cumulative.[4]

¶24    Nor did the defense object to the sixth or seventh witnesses.  The sixth witness, Kainibi Park, testified about an incident in January 2017 when Madeline said that Kim had hit her.  The seventh witness, Michelle Geldernick, worked with Madeline for the National Guard and testified that she and Brandon Grodsky went to Madeline's residence in August 2018 after Madeline missed work.  Only Grodsky went inside Madeline's residence, but the next day Madeline told Geldernick that Kim had beaten her with his fists and with a dog toy. Geldernick also testified that after the September assault, Madeline had said that Kim had "strangled her to the point of passing out and that she thought she was going to die and he was going to kill her."

¶25    Just prior to Grodsky's testimony, the defense objected, asking the circuit court to prohibit as cumulative any further testimony from forfeiture-by-

---

[3] Though we number the witnesses here, we note that they did not testify sequentially and there were often other witnesses interspersed between the witnesses identified here.

[4] At certain points, the defense objected to some testimony on the ground that there had been no pretrial admissibility ruling.

wrongdoing witnesses. The court permitted Grodsky's testimony, concluding that because he was the only person to enter the residence, he could testify to things that other witnesses could not. The court acknowledged that there would be some "overlapping," but it cautioned that as much as possible the State should try to limit the witness testimony to new matters.

¶26 Following Grodsky's testimony—which included Madeline's accusation that Kim had hit her, choked her, and bit her in August 2018—the defense renewed its objection to further forfeiture-by-wrongdoing testimony. The circuit court overruled the objection and permitted limited inquiry into Madeline's statements during the testimony of Madeline's co-worker, Thomas Neuhengen. Reviewing the specific statements from Madeline that the State sought to admit pretrial, the court ruled that the State had "great latitude" to inquire about Madeline's statement to Neuhengen that she was terrified of Kim, which she said while she was showing Neuhengen the bruises and bite marks that Kim had caused. But the court instructed the prosecutor to "be very quick" on Madeline's statement that Kim had choked her and that Kim had told Madeline he would kill her if she divorced him. The transcript demonstrates that the prosecutor adhered to these directives without further objection by the defense.

¶27 On the fifth day of trial, the State sought to introduce additional forfeiture-by-wrongdoing testimony from the tenth and eleventh witnesses, Victoria Tonnacliff and Marlena Wagner. The defense again objected, arguing their testimony was cumulative and a waste of time. Similar to its handling of Neuhengen's testimony, the court overruled the objection, instructing the State to limit its inquiry into matters that had already been addressed, but allowing free inquiry into new matters.

11

¶28    Tonnacliff testified that in July of 2018, Madeline told her that Kim was hitting her and abusing her and that it was getting "progressively worse." After reading some text messages from Madeline discussing the abuse,[5] Tonnacliff was asked what Madeline had said on August 24, 2018, when Tonnacliff observed bruising during a ride to the airport. Madeline told Tonnacliff that Kim had hurt her ribs and face, and she said that Kim would kill her if anyone else found out about the abuse.

¶29    Wagner, Madeline's sister, testified after the State agreed to "pare down her testimony" based upon the defense concerns. She testified that Madeline had a black eye and bruising on her arm on September 1, 2018. She also testified that after the September assault, Madeline "open[ed] up to" her about the abuse. In a single narrative answer, Wagner testified that Madeline told her she had gotten in a fight with Kim on September 22, and he hit and choked her. When Madeline tried to get away, Kim pinned her to the ground, bit her, strangled her again, and threatened to kill her dog when it tried to protect her.

¶30    Kim has not demonstrated that the circuit court erroneously exercised its discretion when deciding the objections to forfeiture-by-wrongdoing testimony rooted in the cumulative or unduly prejudicial nature of the evidence. The court considered the nature of the proffered testimony and appropriately balanced the State's opportunity to prove its case, including by rebutting credibility inferences available as a result of the defense cross-examination of

---

[5] During discussions about what statements would be admitted, the defense acknowledged that it was not objecting to the text messages from Madeline the State intended to introduce through Tonnacliff.

prior witnesses, with the defense interests in avoiding cumulative evidence. As the court noted, the fact that Madeline talked to several people added to the credibility of her statements. In response to the objections, the court appropriately granted the State considerable leeway for "new" testimony, but also constrained the State to only a question or two on Madeline's statements that had been addressed by other witnesses.

¶31 Indeed, this conclusion is consistent with the observations of both defense counsel and the circuit court following Neuhengen's testimony. Defense counsel stated:

> [The prosecutor] yesterday I thought did a good job of hitting the issues that we already hit before at the very end. She didn't dwell into them. She just basically elicited some quick testimony on the issues that we have already gone through four or five times. She did that and that might be the best way to approach the issues we have already dealt with all these other witnesses.

The court responded that the prosecutor "did live up to the spirit of what the [c]ourt was trying to do, and most of them were one foundational question and then the question [about Madeline's statement]."

¶32 Nor did, in our view, the questioning become cumulative as a matter of law. Although the parties generally address the forfeiture-by-wrongdoing witnesses as one group, their individual testimony frequently concerned only one of the multiple events at issue. For example, some of the witnesses testified about Madeline's statements after the August abuse, and some testified about her statements after the September abuse. The cumulative nature of the testimony was diminished by the numerous instances of domestic abuse with which the trial was concerned.

13

¶33 Finally, we agree with the State that any error in admitting cumulative testimony was harmless. *See* WIS. STAT. §§ 805.18(1); 972.11(1). "An error affects the substantial rights of a party [under § 805.18(1)] if there is a reasonable probability of a different outcome, meaning 'a probability sufficient to undermine [our] confidence in the outcome'" of the trial. *State v. Kleser*, 2010 WI 88, ¶94, 328 Wis. 2d 42, 786 N.W.2d 144 (citation omitted). Based on the totality of the evidence adduced during the course of the ten-day trial, there is no reasonable probability that the small number of arguably cumulative statements by Madeline to others affected the outcome of the trial.

*By the Court.*—Judgments affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.